# Illinois Official Reports

## Appellate Court

---

### *People v. Kent*, 2017 IL App (2d) 140917

---

| | |
|---|---|
| Appellate Court Caption | THE PEOPLE OF THE STATE OF ILLINOS, Plaintiff-Appellee, v. LORENZO KENT, JR., Defendant-Appellant. |
| District & No. | Second District<br>Docket No. 2-14-0917 |
| Filed | June 27, 2017 |
| Decision Under Review | Appeal from the Circuit Court of Winnebago County, No. 13-CF-1611; the Hon. Fernando L. Engelsma, Judge, presiding. |
| Judgment | Reversed and remanded. |
| Counsel on Appeal | Michael J. Pelletier, Thomas A. Lilien, and Christopher M. McCoy, of State Appellate Defender's Office, of Elgin, for appellant.<br><br>Joseph P. Bruscato, State's Attorney, of Rockford (Patrick Delfino, Lawrence M. Bauer, and Joan M. Kripke, of State's Attorneys Appellate Prosecutor's Office, of counsel), for the People. |
| Panel | JUSTICE BURKE delivered the judgment of the court, with opinion.<br>Justices McLaren and Zenoff concurred in the judgment and opinion. |

**OPINION**

¶ 1        In the direct appeal of his first degree murder conviction, defendant, Lorenzo Kent, Jr., argues that (1) he was not proved guilty beyond a reasonable doubt because the State's witnesses were not credible, (2) the trial court erred in admitting a Facebook post without sufficient authentication, and (3) the court erred in admitting the unauthenticated, computer-generated records of a phone allegedly used by defendant and in allowing the State to use inadmissible hearsay evidence of the victim's phone number to show that defendant called him repeatedly on the date of the offense. We reverse and remand.

¶ 2                                    I. BACKGROUND

¶ 3        Defendant was convicted of first degree murder in that he, while armed with a firearm, without lawful justification, and with the intent to kill or do great bodily harm to Donmarquis Jackson, shot and killed him. See 720 ILCS 5/9-1(a)(1) (West 2012). Defendant received an extended-term sentence of 55 years' imprisonment for personally discharging the weapon. See 730 ILCS 5/5-8-1(a)(1)(d)(iii) (West 2012).

¶ 4        On the evening of May 6, 2013, Donmarquis was shot in the driveway of 1428 Nelson Boulevard in Rockford, where he resided with his girlfriend, Doris Gregory, and her mother, Sally Gregory. Donmarquis did not get along with his former girlfriend, Kimiko Wilson, who was in a relationship with defendant around the time of the shooting. Donmarquis and Kimiko had two children together. Two days before the murder, defendant accompanied Kimiko to 1428 Nelson Boulevard and was involved in a violent altercation with Donmarquis and Donmarquis's friend, Deshon Thompson. *People v. Kent*, 2016 IL App (2d) 140340.

¶ 5        Before trial, the parties filed opposing motions *in limine* disputing the admissibility of a screenshot of a post on a Facebook profile under the name "Lorenzo Luckii Santos." The day after the murder, a detective took a screenshot of the post, which showed a photograph of someone allegedly resembling defendant and an undated post that read, "its my way or the highway…..leave em dead n his driveway."

¶ 6        At the hearing on the motions, the parties disputed whether the State could lay an adequate foundation. The State represented that it would introduce evidence at trial that (1) Santos was the last name of defendant's mother, (2) Donmarquis was killed in his driveway, (3) the photograph resembled defendant, and (4) "Facebook records will have an IP [Internet protocol] address that belongs to Kimiko." The court granted the State's motion, ruling that the Facebook post was admissible "subject to foundational requirements" being met at trial.

¶ 7                                    A. The State's Case
¶ 8                                        1. Genesis
¶ 9        The State's evidence consisted primarily of the testimony of two teenagers who had not previously known defendant but had spent time with him or observed him on the date of the offense. Genesis Burrell was 14 years old on the date of the shooting. The day before the shooting, Genesis got into an argument with her mother and spent the night at the home of her friend Mikayla Allen. The next morning, when Mikayla went to school, Genesis went to Blackhawk Park and fell asleep. Defendant, whom she did not know, woke her and said that his name was Lucky. Defendant was wearing all black and had a "Dora the Explorer" book

bag. On the left side of his neck, he had a "pretty good size" black star tattoo. Defendant told Genesis that his kids had been taken away because of "his baby mama's boyfriend," named "Don." Defendant explained that he had fought with Don a couple of days before and wanted to kill him. Defendant asked Genesis to walk past Don's house to see if he would come out, and Genesis agreed. While they were walking past the house, defendant asked for Genesis's jacket, which he put over his head.

¶ 10 Genesis and defendant returned to the park and got into a truck. A man and a woman, whom defendant appeared to know, were already inside. Defendant told them that "he had gotten into a fight with his baby mama's boyfriend and his [kids] had got taken." The woman made a phone call, and defendant began yelling that the person on the phone "wasn't a real man." They stopped at a gas station, where the woman got out. Defendant took a gun and bullets out of the book bag. He said that he had put "Vaseline" on the bullets and was not going to miss. When the woman returned to the truck, they drove back to the park and defendant and Genesis got out. Genesis felt "extremely scared" but did not leave, because she "couldn't get away at that point."

¶ 11 Genesis and defendant walked to a beauty supply store, but she did not go inside. Genesis walked into a nearby "Mexican place" but did not call the police or ask anyone for help. While they were near the beauty supply store, defendant asked Genesis for a cell phone. Genesis knew that Mikayla had one, so they walked to her bus stop and waited for her. After Mikayla got off the bus, they all walked to Blackhawk Park, where Mikayla charged her phone.

¶ 12 Defendant used Mikayla's phone to ask someone for "Don's number." Defendant said that they were waiting for a text message, but it did not come. Defendant made a couple of calls, but Genesis thought that he did not speak to anyone. Genesis pretended to make a call, after which she told defendant that she and Mikayla were going to get Don. They went to Mikayla's house instead.

¶ 13 Genesis spent an hour at Mikayla's house, but she did not call the police or tell an adult what had happened. Mikayla's grandmother drove Genesis to Wesley Johnson's house. Later that evening, Genesis went back to Blackhawk Park with Wesley, his sister Alice, and other friends. Genesis saw defendant, who had changed clothes. He was wearing all red and had a black "do rag" on his head. He was also carrying a black book bag. While Genesis was with Wesley, Alice, and others, defendant approached and said, "I guess it didn't go through." Genesis told Wesley that defendant had a gun, but Wesley did not believe her.

¶ 14 Genesis left the park with Wesley, Alice, and others. Defendant had already left the park, walking in a different direction. Genesis began walking to Wesley's house. On her way, she saw defendant again and hid in the bushes. At Wesley's house, Genesis was eating with Wesley and his family when she heard gunshots and sirens. They all went outside.

¶ 15 Genesis spent the night at Mikayla's house. The next morning, a police officer came to pick up Genesis because she had run away from home. The officer placed her in the back of a squad car and mentioned that there had been a shooting on Nelson Boulevard. Genesis began telling the officer about defendant. She said that she first met defendant when she was at the park with Wesley and other people. She described defendant's gun as a revolver and a ".38 special."

¶ 16 Later, Genesis gave the police a written statement that defendant had directed her to call someone. "Don" answered the phone and told her to stop calling. He said that he had gotten into a fight a couple of days ago and wanted to be left alone. He thought that the call was a setup. Genesis said that she had the wrong number and hung up the phone. In her written

- 3 -

statement, Genesis also said that, when she left the park for the second time, she went to a bus stop and waited for a bus.

¶ 17    Before trial, Genesis identified defendant in a photographic lineup. The person she selected in the lineup did not have a star tattoo. Police officers showed her a book bag, but it was not the book bag that defendant had that night. At the time of trial, Genesis was in juvenile detention for a retail theft charge that had been diverted. She expected to go home following her testimony.

¶ 18                                              2. Wesley

¶ 19    Like his friend Genesis, Wesley was 14 years old on the date of the murder. He testified that, around 7:45 p.m., he, Genesis, and others went to Blackhawk Park, where he saw a man wearing all black and carrying a red backpack. The man was standing on a balcony, looking at Genesis. Wesley never saw Genesis talk to this man. Genesis left the park to go to Wesley's house, and the man left sometime later.

¶ 20    Around 8:30 p.m., Wesley left the park and went to his house, where he, his nephew, and his friend got bikes and started riding around the neighborhood. The chain fell off Wesley's bike, and he walked alongside it. Across the street, he saw some people on the enclosed porch at 1428 Nelson Boulevard. One man left the porch and "went around the back," on the right side of the house.

¶ 21    The same man Wesley had seen on the balcony at the park came from an alley behind 1428 Nelson Boulevard. The man "hopped" over a small gate near the garage behind the house. He held a gun, which Wesley thought looked like a .45 caliber. After hopping the fence, the man was "sliding" on the side of the house. He grabbed his backpack and began loading the gun. He fired three or four shots at the man who had left the porch. The shooter ran back the way he came. Wesley went back to his house, which was a couple of blocks from the shooting. He heard squad cars but did not talk to the police that night.

¶ 22    Two days after the shooting, Wesley was shown a six-person photographic lineup, but he was not sure which person was the shooter. Wesley narrowed down the lineup to two photographs, one of which was of defendant. The officer administering the lineup did not consider this to be a positive identification. Wesley did not identify defendant in court.

¶ 23                                              3. Mikayla

¶ 24    Mikayla was also 14 years old on the date of the shooting. She testified that she once met Genesis and a man named Lucky at her bus stop, but she could not remember when this meeting occurred. She knew Lucky's name only because Genesis told it to her. In court, Mikayla identified defendant as Lucky.

¶ 25    Mikayla testified that she gave her phone to Genesis, who gave it to defendant, who called someone and said, "Text the number to the phone." Later, a text came through. Defendant dialed a number and gave the phone to Genesis. Defendant asked if she remembered what to say, and Genesis spoke into the phone. Afterward, they all went to Blackhawk Park, where Mikayla charged her phone.

¶ 26    At the park, Genesis told Mikayla that defendant was going to kill a man "over some kids or something." Genesis said that defendant wanted her to get this man and bring him to the park. As Genesis was saying this to Mikayla, defendant was "not really" near them. After she

looked at her prior statement to refresh her recollection, Mikayla testified that defendant reacted to what Genesis was saying by nodding. On cross-examination, Mikayla testified that, "at some point" during the conversation with Genesis, "Lucky walked up and started nodding."

¶ 27 Later, Mikayla's phone rang. Defendant said to "go get him" and "bring him back to the park." Genesis and Mikayla went from Blackhawk Park to the home of Mikayla's friend MacKenzie and then to Washington Park and Mikayla's house. Mikayla's grandmother drove Genesis to Wesley's house. Genesis later returned to Mikayla's house and spent the night there. The next morning, the police came to get Genesis. Mikayla did not talk to the police at that point and never went to the police on her own.

¶ 28 Mikayla testified that she had identified defendant in a photographic lineup. She also recognized one of the State's exhibits as defendant's backpack. Mikayla never saw defendant with a gun or bullets or acting aggressively. Everything else she had learned about defendant came from Genesis.

¶ 29                                          4. Officer Weber

¶ 30 Rockford police officer Nicholas Weber testified that he was dispatched to 1428 Nelson Boulevard around 9 p.m., in reference to a possible shooting. When he arrived, people on the porch pointed to the driveway, where a man was lying facedown. It was dark and the only light came from a street light that was "down the street a little bit." The driveway area was "pretty dark." Officer Weber said that, without his flashlight, he "definitely" could not have seen the backyard and the part of the driveway farthest from the street. The proximity of the house to the unattached garage made it "impossible" to see the backyard even when standing in the driveway.

¶ 31 At the scene, officers found three spent .22-caliber casings between the back porch and the garage. It would have been "very difficult" for someone on the street to see where the casings were found. Near the casings, officers found two damaged cell phones, both of which appeared to have been struck by gunfire.

¶ 32 Inside a fake sprinkler head in the backyard, officers found 19 bags containing over three grams of crack cocaine. Officers also found a scale at the side of the garage.

¶ 33 The victim had five gunshot wounds, and the medical expert testified that he died from a gunshot wound to his back, which went through his rib, heart, and lung.

¶ 34                                          5. Denise

¶ 35 Denise Gregory testified that she was at Sally's house on the night of the shooting. Denise was sitting on the porch with Donmarquis and Theodore White. Donmarquis received a phone call and walked to the side of the house. Denise heard gunshots and ran in the house with Theodore. She did not see the shooting. When she ran in the house, a man whom she did not know came in behind her. While still on the porch, she had seen someone wearing all white and walking a bike down the sidewalk with a bag in his hand, but he did not look suspicious.

¶ 36                                          6. Doris

¶ 37 Doris testified to the altercation at her house that occurred two days before the shooting. On May 4, 2013, defendant and Kimiko arrived at the house and began arguing with Donmarquis. Defendant and Donmarquis began fighting. Defendant had a pocketknife during

- 5 -

the fight, but Donmarquis was not cut. After the fight, defendant and Kimiko left with the children.

¶ 38    On May 6, Doris was at the house with Donmarquis. A few minutes after 9 p.m., Doris heard gunshots. She went outside, saw Donmarquis lying on the driveway, and called the police. Doris recalled that it was "pitch dark" outside.

¶ 39    Doris testified that Donmarquis had two cell phones. She did not remember the numbers at trial, but she gave the numbers to the police on the night of the shooting.

¶ 40                                                7. Deshon

¶ 41    Deshon also testified to the conflict before the shooting. On May 4, 2013, he was driving with Donmarquis, who began arguing with someone on the phone. Deshon and Donmarquis drove to 1428 Nelson Boulevard. After they had been there for a couple of minutes, another car pulled up. Defendant and a woman got out of the car and began arguing with Donmarquis in the front yard. As Donmarquis was walking into the house, defendant struck him from behind, and they started fighting on the enclosed porch. After 90 to 120 seconds, Donmarquis called for Deshon, who broke up the fight.

¶ 42    Defendant pulled out a knife. Donmarquis ran off the porch, and defendant said, "Bitch, I'm gonna kill you." Defendant never tried to strike Donmarquis with the knife. Defendant also walked off the enclosed porch, said that he was calling the police, and left with the woman and the kids. Donmarquis had "a few minor cuts" on his forehead, a bite mark on the top of his head, and minor scrapes on his knee and elbow.

¶ 43                                                8. DCFS

¶ 44    On May 5, 2013, Aimee Jerding, a caseworker for the Department of Children and Family Services (DCFS), went to Kimiko's apartment regarding the fight between defendant and Donmarquis. Based on the investigation, Kimiko's and Donmarquis's children were taken and placed into protective custody.

¶ 45                                          9. Kimiko's Apartment

¶ 46    Detective Joseph Stevens testified that, on May 8, 2013, at 9:15 p.m., he went to Kimiko's apartment to investigate the porch incident. Detective Stevens saw defendant exiting the rear bedroom. In a subsequent search, officers found two .22-caliber bullets in that bedroom. One bullet was on top of a bed, and one was under the bed. Detective Stevens testified that .22-caliber ammunition was fairly common. No firearms were found in the apartment.

¶ 47    Detective Scot Mastroianni also saw defendant leave the bedroom where the bullets were found. Detective Mastroianni did not see where defendant had been in the bedroom. An empty backpack was found in a different bedroom. Detective Mastroianni did not recall seeing a tattoo on defendant's neck.

¶ 48    Christina Davison, a forensic scientist specializing in firearms identification, testified that the three spent .22-caliber shell casings found at the scene were fired from the same gun. The three bullets found in Donmarquis's body were also fired from the same gun. Davison was unable to conclude whether the unfired .22-caliber bullets found in Kimiko's apartment were from the same source. The brand stamped on the unfired bullets was different from the brand

on the casings found at the scene.

¶ 49                                    10. Mikayla's Phone

¶ 50    Relying on a certificate from the custodian of the records, the prosecution moved to admit cell phone records as business records. The defense objected to the absence of evidence that the computer used to generate the phone records was "accurate and operating properly when the evidence was generated." The phone records for 779-***-2350 showed that the phone associated with that number was registered to Mikayla. The court admitted the records.

¶ 51    The records indicated that on May 6, 2013, Mikayla's phone called 773-***-5921 at 4:10 p.m. and 4:38 p.m. Mikayla's phone also received 10 calls from that number between 4:14 p.m. and 5:06 p.m. Attached to these records was a certificate that stated that the records "(a) [w]ere made at or near the time of the occurrence of the matters set forth in the records by, or from information transmitted by a person with knowledge of those matters; (b) [w]ere kept in the course of a regularly conducted business activity; and (c) [w]ere made by the regularly conducted activity as a regular practice."

¶ 52                                  11. Donmarquis's Phones

¶ 53    Detective Dave Swanson testified that Doris gave him the numbers for Donmarquis's two phones, but he could not recall them at trial. After refreshing his recollection with Doris's statement in his police report, Detective Swanson testified that the phone numbers he subpoenaed as Donmarquis's were 815-***-9353 and 773-***-5921 but that the subscribers for those numbers were in Texas and California, respectively. Defense counsel objected to this testimony as hearsay based on what Doris told Detective Swanson. The court overruled the objection, holding that it was admissible as a past recollection recorded.

¶ 54                                    12. Facebook Post

¶ 55    The defense renewed its objection to the Facebook evidence. The State indicated that Detective Dwayne Beets would testify that he searched the Facebook website and found a profile under the name "Lorenzo Luckii Santos" with defendant's photograph and the relevant post. The court held that this was a sufficient foundation.

¶ 56    Detective Beets testified that he had been using Facebook for approximately one year. He explained that a Facebook profile is "a visual display of personal information usually specific to a user" and that a post is a message created by a user that can be shared with a select group of people or with the general public. Anyone could set up a profile using an e-mail address. Detective Beets had created a profile under the name "Daquan Rogers," which was used for investigations. The profile contained a picture of someone other than the detective.

¶ 57    On May 7, 2013, using his fake profile, Detective Beets searched Facebook and found a profile under the name "Lorenzo Luckii Santos." A photo on that profile resembled defendant. Detective Beets previously had seen defendant's photo when he created the photo lineup. On the Santos profile, Detective Beets saw a post that said, "its my way or the highway.....leave em dead n his driveway." Detective Beets testified that the profile name "Lorenzo Luckii Santos" was "associated" with this post, and he printed a screenshot of the post. The detective offered no testimony about when the post was created, but he testified that it was deleted later that day.

¶ 58    Following Detective Beets's testimony, the defense renewed its objection to the Facebook evidence, arguing that there had been insufficient authentication. Despite its pretrial assurances, the State had failed to link the name "Santos" to defendant or to present Facebook records to establish that the post originated from Kimiko's IP address. The court overruled the objection, finding that the post was sufficiently authenticated with the name, defendant's photo, and the statement about the shooting.

¶ 59                                B. The Defense

¶ 60    Shannon Watters testified that, on May 6, 2013, she was living next door to 1428 Nelson Boulevard. That night, she heard gunfire. After the shooting stopped, she looked out her window and saw someone lying on the ground. Shannon called 911 and saw two men approach the man on the ground and search his pockets. Shannon had noticed a lot of foot traffic in and out of 1428 Nelson Boulevard, which decreased "a little bit" after the day of the shooting.

¶ 61    Matt Weber, an investigator for the public defender's office, testified that he spoke to Genesis before trial. Genesis told Weber that defendant was not with her when she went to Mikayla's bus stop. Weber also spoke with Mikayla, and she never said that defendant was nodding when Genesis said that he wanted to hurt someone.

¶ 62    Weber took pictures of 1428 Nelson Boulevard while standing across the street. From this position, he could not see the backyard or the gate area. When he stood in front of the house next door, Weber could see "very, very little of the backyard" and he was unable to see the gate area or the alley.

¶ 63                            C. Posttrial Proceedings

¶ 64    The jury found defendant guilty of first degree murder. The defense moved for a new trial, arguing that defendant was not proven guilty beyond a reasonable doubt and that the court erred in admitting the Facebook post, Mikayla's phone records, and "evidence of Donmarquis Jackson's phone numbers through the improper hearsay testimony of Detective Swanson." The court denied the motion and imposed a 55-year prison term. This timely appeal followed.

¶ 65                                II. ANALYSIS

¶ 66    On appeal, defendant raises three issues. First, he argues that he is entitled to an outright reversal of his conviction because the State's witnesses were not credible and he was not proved guilty beyond a reasonable doubt. Second, defendant argues that he deserves a new trial because the trial court erred in admitting the Facebook post without sufficient authentication. Third, he seeks a new trial because the court admitted the computer-generated records for Mikayla's phone without an adequate foundation and allowed hearsay evidence regarding Donmarquis's phone number. For the following reasons, we conclude that, although the evidence supports the conviction, defendant is entitled to a new trial because the trial court committed reversible error in admitting the Facebook post.

¶ 67                        A. Sufficiency of the Evidence

¶ 68    On a challenge to the evidence supporting a criminal conviction, a reviewing court does not retry the defendant. *People v. Smith*, 185 Ill. 2d 532, 541 (1999). "When reviewing the sufficiency of the evidence, 'the relevant question is whether, after viewing the evidence in the

light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt.' (Emphasis in original.)" *People v. Bishop*, 218 Ill. 2d 232, 249 (2006) (quoting *Jackson v. Virginia*, 443 U.S. 307, 319 (1979)); *People v. Collins*, 106 Ill. 2d 237, 261 (1985). "Testimony may be found insufficient under the *Jackson* standard, but only where the record evidence compels the conclusion that no reasonable person could accept it beyond a reasonable doubt." *People v. Cunningham*, 212 Ill. 2d 274, 280 (2004). Our duty is to carefully examine the evidence while giving due consideration to the fact that the finder of fact saw and heard the witnesses. The testimony of a single witness, if it is positive and the witness is credible, is sufficient to convict. *Smith*, 185 Ill. 2d at 541. The credibility of a witness is within the province of the trier of fact, and its finding on such matters is entitled to great weight, but the fact finder's determination is not conclusive. We will reverse a conviction where the evidence is so unreasonable, improbable, or unsatisfactory that it creates a reasonable doubt of the defendant's guilt. *Smith*, 185 Ill. 2d at 542. This standard of review applies regardless of whether the evidence is direct or circumstantial and regardless of whether the defendant was tried before the bench or a jury. *People v. Cooper*, 194 Ill. 2d 419, 431 (2000).

¶ 69     Defendant was convicted primarily on the testimony of Wesley and Genesis, who each were 14 years old at the time of the offense. Wesley was the only witness who claimed to have seen the shooting. He testified that he saw a man on a balcony near the park. The man left the area, and Wesley went home around 8:30 p.m. because Genesis and Alice were already there. Wesley, his nephew, and his friend got bikes and started riding around the neighborhood until the chain fell off Wesley's bike.

¶ 70     While walking the bike, Wesley passed 1428 Nelson Boulevard and saw people on the enclosed porch. Wesley was across the street. He testified that he was wearing all white, and Denise confirmed seeing someone wearing white at the time of the shooting.

¶ 71     Wesley testified that the victim left the porch and "went around the back" along the driveway on the right side of the house, though his written statement to the police did not mention seeing the victim on the porch. Wesley testified that the man from the balcony near the park came from the alley behind the house and "hopped" over a small gate near the garage behind the house. The man held a gun, which Wesley thought looked like a .45 caliber, though the shell casings were .22 caliber. The man was "sliding" on the side of the house, and he grabbed his backpack and began loading the gun. He fired three or four shots at the victim. The shooter ran back the way he came. Wesley went back to his house, which was a couple of blocks away.

¶ 72     Defendant argues that Wesley's testimony was simply not credible because, "based on the darkness and the layout of the house and the unattached garage, it would have been 'impossible' for him to have seen what he described." Officer Weber, who responded to the shooting around 9 p.m., testified that the only light in the area came from a street light that was "down the street a little bit." He described the driveway area as "pretty dark." Officer Weber said that, without his flashlight, he "definitely" could not have seen the backyard and the part of the driveway away from the street. Doris also testified that it was "pitch dark" at the time of the shooting.

¶ 73     Defendant also emphasizes Officer Weber's testimony that the close proximity of the house to the unattached garage made it "impossible" to see between them and into the backyard, even when standing in the driveway. Officer Weber testified that it would have been

"very difficult" for someone on the street to see where the shell casings were found. Also, Matt Weber testified that he took pictures of 1428 Nelson Boulevard while standing across the street and could not see the backyard or the gate from that position. Weber said that, when he stood in front of the house next door to 1428 Nelson Boulevard, he could see "very, very little of the backyard" and could not see the gate or the alley.

¶ 74     Defendant also points out the discrepancies between Wesley's trial testimony, his statements to police, and Genesis's accounts of the events. For example, Genesis testified that she was with Wesley at his house when the shots were fired. Furthermore, when reviewing a six-photograph lineup two days after the shooting, Wesley picked out two photographs. One of the two was of defendant, but Wesley could not say definitively which one was the shooter. Wesley did not identify defendant in court as the shooter.

¶ 75     We conclude that the weaknesses in Wesley's testimony do not compel reversal of the conviction. The jury was shown photographs of the crime scene, including several taken on the night of the shooting and others subsequently taken by Matt Weber. The jury was free to consider Wesley's testimony in the context of those photographs and the diagrams of the driveway, sidewalk, and structures in the area, which admittedly showed a dimly lit and narrow sightline from the sidewalk to the backyard. Wesley's credibility was within the province of the jury, and the implicit finding that he was credible is entitled to great weight. See *Smith*, 185 Ill. 2d at 541.

¶ 76     Defendant effectively argues that the conviction must be reversed because Wesley could not have observed the shooting as he described and therefore there was no evidence to support the conviction. This argument obliquely suggests that the State was required to produce direct evidence of defendant's guilt. However, it is well settled that guilt may be proven by direct evidence or circumstantial evidence. See *Cooper*, 194 Ill. 2d at 431. And Wesley's testimony was not the only such evidence.

¶ 77     Defendant also argues that Genesis was not credible, in part, because her story of spending the day with defendant, whom she had never met before, simply was not plausible. At trial, she described traveling with defendant, helping him try to find the man he wanted to kill, walking past the victim's home with her jacket on defendant's head, and introducing him to Mikayla, even though defendant neither threatened Genesis nor promised her anything. Despite having many chances to leave or ask for help and being "extremely scared," she did not attempt to flee or alert anyone to her situation, and she offered no explanation at trial.

¶ 78     Defendant also points out that, along with providing prior inconsistent details of the events, Genesis (1) mistakenly described defendant as having a large star tattoo on his neck, (2) said that he claimed to have a .38-caliber revolver, while the murder weapon was a .22caliber that discharged shell casings automatically, and (3) misidentified Kimiko as someone named "Ree Ree."

¶ 79     Again, these points are favorable to defendant but do not compel reversal because there is significant circumstantial evidence of his guilt. Genesis testified to defendant's statements about wanting to kill someone named Don. Defendant's feud with Donmarquis over his children with Kimiko escalated to a brawl on the porch of 1428 Nelson Boulevard, and Donmarquis was shot in the driveway at that address two days later. During the porch fight, defendant brandished a knife and threatened to kill Donmarquis. When defendant was arrested in Kimiko's apartment after the shooting, he was seen exiting a bedroom where two .22-caliber bullets were found on and under a bed. When considering all of the evidence in the light most

favorable to the prosecution, we conclude that a rational trier of fact could have found the essential elements of first degree murder beyond a reasonable doubt. See *Cunningham*, 212 Ill. 2d at 278.

¶ 80                                    B. Facebook Post

¶ 81    Defendant next argues that the trial court erred in admitting a screenshot of a Facebook post on a profile under the name "Lorenzo Luckii Santos." The screenshot showed a photograph of someone allegedly resembling defendant and an undated post that states, "its my way or the highway…..leave em dead n his driveway." The trial court deemed the evidence admissible "subject to foundational requirements" being met at trial.

¶ 82    At trial, Detective Beets testified that, on May 7, 2013, he accessed Facebook. He explained that a profile is "a visual display of personal information usually specific to a user" and that a post is a message created by a user that can be shared with a select group of people or with the general public. Detective Beets admitted that anyone can set up a profile using an e-mail address, as illustrated by his creation and use of a fake profile for investigation purposes. The profile had a name and a photograph that were not his.

¶ 83    Using his fake profile, Detective Beets searched Facebook for the name "Lorenzo" and found a profile under the name "Lorenzo Luckii Santos." According to the detective, the photo on that profile resembled defendant. On the Santos profile, Detective Beets saw a post that said, "its my way or the highway..…leave em dead n his driveway." Detective Beets testified that the profile name "Lorenzo Luckii Santos" was "associated" with this post, and he printed a screenshot.

¶ 84    Defendant argues that the trial court abused its discretion in allowing the Facebook post and Detective Beets's testimony. We agree. Despite claiming that Facebook records would show that the Facebook profile was associated with an IP address belonging to Kimiko, the State presented no evidence of circumstances surrounding the post's creation to show that defendant was responsible for its contents.

¶ 85    Testimony is admissible if it is relevant to an issue in dispute. *People v. Patterson*, 192 Ill. 2d 93, 114-15 (2000). "Relevant evidence" is defined under our rules of evidence as "evidence having any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." Ill. R. Evid. 401 (eff. Jan. 1, 2011); see also *People v. Harvey*, 211 Ill. 2d 368, 392 (2004). The trial court has discretion to determine whether evidence is relevant and admissible, and therefore, an evidentiary ruling will not be overturned unless it is arbitrary, fanciful, or unreasonable. *People v. Hanson*, 238 Ill. 2d 74, 101 (2010). A court may exercise its discretion and exclude evidence, even if it is relevant, if the danger of unfair prejudice substantially outweighs its probative value. *Hanson*, 238 Ill. 2d at 102.

¶ 86    The parties agree that, despite its digital nature, the Facebook post qualifies as a document for admissibility purposes. *Cf. People v. Chromik*, 408 Ill. App. 3d 1028, 1046-47 (2011) (e-mail and text messages are treated like any other form of documentary evidence). A party must lay a proper foundation before a document may be entered into evidence. *Piser v. State Farm Mutual Automobile Insurance Co.*, 405 Ill. App. 3d 341, 348 (2010). Authentication of a document may be made by direct or circumstantial evidence, which is routinely the testimony of a witness who has sufficient personal knowledge to satisfy the trial court that the item is, in fact, what its proponent claims it to be. *Piser*, 405 Ill. App. 3d at 349. Illinois Rule of Evidence

901 (eff. Jan. 1, 2011) provides that "[t]he requirement of authentication or identification as a condition precedent to admissibility is satisfied by evidence sufficient to support a finding that the matter in question is what its proponent claims."

¶ 87                                            1. *Vayner*

¶ 88        The parties have not cited, and our research has not uncovered, any Illinois case addressing the admissibility of a Facebook post allegedly attributable to a criminal defendant. While lower federal court decisions are not binding upon state courts, we may look to them as persuasive authority. *People v. Betance-Lopez*, 2015 IL App (2d) 130521, ¶ 31. Having looked to such decisions, we conclude that *United States v. Vayner*, 769 F.3d 125 (2d Cir. 2014), best represents a line of cases that is on point and persuasive.

¶ 89        In *Vayner*, the defendant was convicted of the transfer of a false identification document based on his creation of a forged birth certificate for Vladyslav Timku, a Ukrainian citizen residing in Brooklyn. The birth certificate would falsely reflect that Timku was the father of an infant daughter, whose tender age would entitle him to a deferment from compulsory military service in Ukraine. *Vayner*, 769 F.3d at 127.

¶ 90        The district court admitted into evidence a printed copy of a web page that the government claimed was the defendant's profile page from VK.com (VK), a Russian social networking site akin to Facebook. The defendant argued on appeal that the page had not been properly authenticated under Rule 901 of the Federal Rules of Evidence, which is similar to Illinois Rule of Evidence 901. The Second Circuit Court of Appeals held that the district court had made a reversible error in admitting the web page "because the government presented insufficient evidence that the page was what the government claimed it to be—that is, [the defendant's] profile page, as opposed to a profile page on the Internet that [the defendant] did not create or control." *Vayner*, 769 F.3d at 127.

¶ 91        At trial, Timku claimed to be a friend of the defendant and familiar with his work as a forger because he had previously paid the defendant to create false diplomatic identification documents in a scheme to avoid taxes associated with a corporation called Martex International. According to Timku, the defendant agreed to make the forgery, without charge, as a "favor" and began creating the fake birth certificate on a computer while the pair chatted in a Brooklyn Internet café. The defendant allegedly sent the completed forgery to Timku via e-mail, fromazmadeuz@gmail.com (the Gmail address), an e-mail address that Timku had often used to correspond with the defendant. The government introduced a copy of the e-mail, with the forged birth certificate as an attachment, which reflected that it was sent to the Gmail address. *Vayner*, 769 F.3d at 127.

¶ 92        Other witnesses corroborated Timku's testimony regarding the birth certificate's falsity, the Ukrainian military deferment, and the path of the e-mail through servers. There was expert testimony that the e-mail originated in New York, but no evidence as to what computer it was sent from or what IP addresses were linked to it. Thus, near the conclusion of the government's case, only Timku's testimony directly connected the defendant with the Gmail address. *Vayner*, 769 F.3d at 127-28. Then the government called a special agent to introduce a printout of a web page purporting to be the defendant's VK profile. The district court admitted the web page over the defendant's objection to its authenticity under Federal Rule of Evidence 901. *Vayner*, 769 F.3d at 128.

¶ 93     The special agent identified the printout as being from "the Russian equivalent of Facebook" and noted to the jury that the web page contained a photograph of the defendant and purported to be the profile of a person with an alternate spelling of the defendant's name. The special agent pointed out that under the heading, "Contact Information," the profile listed the Skype address "Azmadeuz," which matched the moniker in the Gmail address. The profile's employment section listed "Martex International" and an Internet café called "Cyber Heaven," which corresponded with Timku's testimony that both he and the defendant had worked for those entities. *Vayner*, 769 F.3d at 128.

¶ 94     On cross-examination, the special agent admitted that he had only a "cursory familiarity" with VK, had never used the site except to view this single page, and did not know whether a user needed any identity verification to create an account on the site. In the final words of its summation, the government argued to the jury that the VK profile linked the defendant to the Gmail address. *Vayner*, 769 F.3d at 128-29.

¶ 95     The Second Circuit recounted Rule 901's provision that " '[t]o satisfy the requirement of authenticating or identifying an item of evidence, the proponent must produce evidence sufficient to support a finding that the item is what the proponent claims it is.' " *Vayner*, 769 F.3d at 129 (quoting Fed. R. Evid. 901(a)). The Second Circuit observed that the requirement is satisfied if sufficient proof has been introduced so that a reasonable juror could find in favor of authenticity or identification; the ultimate determination as to whether the evidence is, in fact, what its proponent claims is thereafter a matter for the jury. *Vayner*, 769 F.3d at 129-30.

¶ 96     Rule 901 does not definitively establish the nature and quantum of proof that is required preliminarily to authenticate an item of evidence. Further, the nature and quantum of evidence needed is related to the purpose for which the evidence is offered and depends on a context-specific determination of whether the proof advanced is sufficient to support a finding that the item in question is what its proponent claims it to be. *Vayner*, 769 F.3d at 130. The Second Circuit declared that "[t]he bar for authentication of evidence is not particularly high" and "[t]he proponent need not rule out all possibilities inconsistent with authenticity, or *** prove beyond any doubt that the evidence is what it purports to be." (Internal quotation marks omitted.) *Vayner*, 769 F.3d at 130. However, there must be at least sufficient proof for a reasonable juror to find in favor of authenticity. *Vayner*, 769 F.3d at 130.

¶ 97     The proof of authentication may be direct or circumstantial, but the simplest and likely most common form is through the testimony of a witness with knowledge that a matter is what it is claimed to be. *Vayner*, 769 F.3d at 130 (citing Fed. R. Evid. 901(b)(1)). "Rule 901(b) provides several examples of proper authentication techniques in different contexts, and the advisory committee's note states that these are 'not intended as an exclusive enumeration of allowable methods but are meant to guide and suggest, leaving room for growth and development in this area of the law.' " *Vayner*, 769 F.3d at 130 (quoting Fed. R. Evid. 901, Advisory Committee Notes). For example, some documents can be authenticated by distinctive characteristics of the document itself, such as its appearance, contents, substance, or internal patterns, taken in conjunction with the circumstances. *Vayner*, 769 F.3d at 130 (citing Fed. R. Evid. 901(b)(4)).

¶ 98     The Second Circuit concluded that the district court abused its discretion in admitting the web page without proper authentication under Rule 901 of the Federal Rules of Evidence. The court observed that "[t]he VK profile page was helpful to the government's case only if it belonged to [the defendant]—if it was his profile page, created by him or someone acting on

his behalf—and thus tended to establish that [the defendant] used the moniker 'Azmadeuz' on Skype and was likely also to have used it for the Gmail address from which the forged birth certificate was sent, just as Timku claimed." *Vayner*, 769 F.3d at 132.

¶ 99   Although it was "uncontroverted that information *about* [the defendant] appeared on the VK page: his name, photograph, and some details about his life that were consistent with Timku's testimony about him[,] there was no evidence that the defendant himself had created the page or was responsible for its contents." (Emphasis in original.) *Vayner*, 769 F.3d at 132. The Second Circuit hypothesized that, if the government sought to introduce a flyer found on the street that contained the defendant's Skype address and was purportedly written or authorized by him, "the district court surely would have required some evidence that the flyer did, in fact, emanate from [the defendant]. Otherwise, how could the statements in the flyer be attributed to him?" *Vayner*, 769 F.3d at 132. The Second Circuit rejected the notion that the mere fact that a web page with the defendant's name and photograph happened to exist on the Internet at the time of the special agent's testimony permitted a reasonable conclusion that the page was created by the defendant or on his behalf. *Vayner*, 769 F.3d at 132.

¶ 100   The Second Circuit reiterated that contents or "distinctive characteristics" of a document can sometimes alone provide circumstantial evidence sufficient for authentication. *Vayner*, 769 F.3d at 132 (citing Fed. R. Evid. 901(b)(4)). For example, a writing may be authenticated by evidence that its contents were not a matter of common knowledge. *Vayner*, 769 F.3d at 132. However, all the information on the VK profile page allegedly tying the page to the defendant was also known by Timku and likely others, some of whom might have had reasons to create a profile page falsely attributed to the defendant. Other than the page itself, no evidence suggested that the defendant even had a VK profile, much less that the page in question was his. *Vayner*, 769 F.3d at 132-33.

¶ 101                                   2. "Lorenzo Luckii Santos" Post

¶ 102   The connection between the Facebook post and defendant in this case is even more tenuous than the connection between the VK web page and the defendant in *Vayner*. The Facebook post was helpful to the State's case only if it belonged to defendant. If he or someone acting on his behalf created it, the State could argue that the statement "its my way or the highway…..leave em dead n his driveway" was a boastful admission by defendant that he murdered Donmarquis in the driveway of 1428 Nelson Boulevard.

¶ 103   However, the State offered neither direct nor circumstantial proof of authentication. Defendant did not admit to creating a Facebook profile or making the post, and he was not seen composing the communication. At the pretrial hearing, the State represented that "Facebook records will have an IP address that belongs to Kimiko." From that evidence, the State might have argued that defendant, Kimiko, or someone else acting on defendant's behalf created the post from her IP address. However, the State presented no Facebook records at trial and even failed to establish that "Santos" was the last name of defendant's mother. Other than Detective Beets's discovery of the post on the day after the offense, no circumstances surrounding the creation of the undated post were introduced at trial.

¶ 104   The State argues that the Facebook post was properly authenticated by evidence that defendant's nickname was "Luckii," Donmarquis was killed in his driveway, and the photograph allegedly resembled defendant. However, this information did not provide circumstantial evidence sufficient for authentication, because the State failed to present any

evidence that it was not public knowledge, which would tend to show that defendant or someone acting on his behalf was responsible for the communication. See *Vayner*, 769 F.3d at 132 (a writing may be authenticated by evidence that its contents were not a matter of common knowledge); see also *People v. Downin*, 357 Ill. App. 3d 193, 203 (2005) (documentary evidence may be authenticated by its contents if it is shown to contain information that would be known only by the alleged author of the document or, at the very least, by a small group of people including the alleged author).

¶ 105     "The authentication of social media poses unique issues regarding what is required to make a *prima facie* showing that the matter is what the proponent claims." *Smith v. State*, 2012-CT-00218-SCT (¶ 19) (Miss. 2014). "Creating a Facebook account is easy." *Smith*, 2012-CT-00218-SCT (¶ 19) (citing Samantha L. Millier, Note, *The Facebook Frontier: Responding to the Changing Face of Privacy on the Internet*, 97 Ky. L.J. 541, 544 (2009)). " '[A]nyone at least thirteen years old with a valid e-mail address could create a profile.' " *Smith*, 2012-CT-00218-SCT (¶ 19) (quoting Nathan Petrashek, *The Fourth Amendment and the Brave New World of Online Social Networking*, 93 Marq. L. Rev. 1495, 1506 (2010)).

¶ 106     "Not only can anyone create a profile and masquerade as another person, but such a risk is amplified when a person creates a real profile without the realization that third parties can 'mine' their personal data. [Citation.] Friends and strangers alike may have access to family photos, intimate details about one's likes and dislikes, hobbies, employer details, and other personal information, and, consequently, the desire to share information with one's friends may also expose users to unknown third parties who may misuse their information." (Internal quotation marks omitted.) *Smith*, 2012-CT-00218-SCT (¶ 19). Thus, concern over authentication arises because anyone can create a fictitious account and masquerade under another person's name or can gain access to another's account by obtaining the user's username and password, and consequently, the potential for fabricating or tampering with electronically stored information on a social networking website is high and poses challenges to authenticating printouts from the website. *Smith*, 2012-CT-00218-SCT (¶ 19) (citing *Griffin v. State*, 19 A.3d 415, 421-22 (Md. 2011)).

¶ 107     In *Vayner*, the special agent admitted that he had only a "cursory familiarity" with VK and did not know whether a user needed some type of identity verification to create an account. An identity verification requirement would tend to show that a particular user was responsible for the content of a profile with his name. In this case, there was affirmative evidence that *no* identity verification is required to create a Facebook profile. In fact, Detective Beets confirmed how easily he created a fake profile for investigation purposes, complete with a name and a photograph that were not his.

¶ 108     The State relies on *Downin* in arguing that the statement in the post was sufficiently obscure that only defendant could have known it, but this case is factually distinguishable. In *Downin*, the defendant was convicted of a sex offense against the victim, whom he met in an Internet chat room when she was 15. She communicated with him through the address nickd@galesburg.net, and their friendship developed into a sexual relationship. *Downin*, 357 Ill. App. 3d at 194. The two maintained contact, and the e-mail address that the victim used to reach him was the same one through which she had always contacted him. *Downin*, 357 Ill. App. 3d at 195.

¶ 109     During a meeting with a detective, the victim sent an e-mail to the defendant, using the same e-mail address. She testified that she received no notification that the e-mail had been

improperly transmitted, and a copy of her communication was admitted into evidence. *Downin*, 357 Ill. App. 3d at 195. Also introduced was a copy of a transmission that the victim testified was the response that she received from the defendant's e-mail address. The victim testified that this communication was in fact responsive to her e-mail and contained information, which she described, that would have been known exclusively to her and the defendant. *Downin*, 357 Ill. App. 3d at 195. In her e-mail, the victim wrote that she was under a lot of stress and was considering telling her mother about the sexual relationship. She requested that the recipient let her know his thoughts. *Downin*, 357 Ill. App. 3d at 195-96. The response e-mail contained admissions of a sexual relationship. *Downin*, 357 Ill. App. 3d at 196.

¶ 110    On appeal, the defendant argued that, without an IP address linking him to the e-mail attributed to him, there was no way of knowing whether the victim falsified the e-mail. *Downin*, 357 Ill. App. 3d at 202. Observing that "*[p]rima facie* authorship of a document may include a showing that the writing contains knowledge of a matter sufficiently obscure so as to be known to only a small group of individuals," the Appellate Court, Third District, affirmed the trial court's finding of authentication. *Downin*, 357 Ill. App. 3d at 203. Among the circumstantial facts were (1) the defendant and the victim met over the Internet; (2) before and after they met in person, they communicated via e-mail; (3) when the detective instigated the victim's e-mail from the public safety building, she directed her communication to the e-mail address that she had used on all prior occasions; (4) the victim received the response from that same address that the defendant had previously used to communicate with her; and (5) the response e-mail was in fact responsive to the e-mail that the victim had sent, and she testified that it contained information known exclusively to her and the defendant. *Downin*, 357 Ill. App. 3d at 203. Thereafter, the defendant was free to, and did, challenge the genuineness of the document, and it was for the trier of fact to make the ultimate determination of authorship. *Downin*, 357 Ill. App. 3d at 203-04.

¶ 111    In *Downin*, the prosecution laid a detailed foundation for the e-mail exchange with evidence that the defendant and the victim had a history of using specific e-mail addresses to communicate. Here, the State offered no evidence that defendant ever accessed Facebook or even used the Internet. At best, the photograph and the name on the Facebook profile are *about* defendant and not evidence that defendant himself had created the post or was responsible for its contents.

¶ 112    Moreover, the statement "its my way or the highway…..leave em dead n his driveway" was not self-authenticated by the fact that the victim was killed in his driveway. The State's reasoning that the post can be attributed to defendant because it is incriminating is circular. To the extent that this information is "obscure," it would be known by the offender, not necessarily by defendant.

¶ 113    Regardless, there was ample testimony that the police activity drew the neighborhood's attention to the shooting, such that the information was not known by only defendant or a small group of people including defendant. Any person could have created the post if he or she knew defendant by his alleged alias, knew about the shooting and the underlying feud, and had digitally mined an image of someone who looked like defendant.

¶ 114    The State's most compelling circumstantial evidence of authentication is Detective Beets's testimony about the fleeting nature of the post. The detective testified that, on the day after the shooting, he discovered the post about 2 p.m., but it was "deleted" later that day. The State's theory is that, after defendant shot the victim, he created the post to boast of the offense, but

thought better of making an incriminating statement on the Internet and deleted the post. According to the State, the content of the post was an admission of guilt by defendant, and its deletion was his attempt to destroy evidence. The State argues that the sudden removal of the post dispels any concern that someone was trying to falsely attribute the statement to defendant. Otherwise, he or she would have left up the post for the police to find.

¶ 115    However, the detective could not say when the post was created, and one could argue that he had no way of knowing that its disappearance from his view was due to deletion. It is possible that a person with access to the account did not delete it at all, but used privacy settings to share it with a targeted audience, for any number of reasons. Although the State certainly could have argued its theory to the jury to show authorship and consciousness of guilt, without more, the ephemeral statement and information about defendant were not sufficient for a reasonable juror to find authenticity.

¶ 116    As in *Vayner*, the State simply offered no evidence that any of the information on the Facebook post was known or available only to defendant or, at the very least, to a small group of people including defendant. See *Vayner*, 769 F.3d at 132; *Downin*, 357 Ill. App. 3d at 203. Worse yet, others who were familiar with defendant might have been motivated to create the post to falsely attribute an incriminating statement to defendant. See *Vayner*, 769 F.3d at 132 (all the information contained on the VK page allegedly tying the page to the defendant was also known by Timku and likely others, some of whom might have had reasons to create a profile page falsely attributed to the defendant). Other than the post itself, the State cites no evidence that defendant even had a Facebook profile, much less that the post was his. See *Vayner*, 769 F.3d at 132-33.

¶ 117    The Facebook post in this case is no different from the hypothetical flyer in *Vayner*. If a printout of the screenshot of the Facebook post had been found on the street, the trial court surely would have required some evidence that it was written or authorized by defendant. Otherwise, the statement on the printout could not be attributed to him. See *Vayner*, 769 F.3d at 132. The mere fact that a Facebook post on a profile with defendant's alleged alias and photograph happened to exist on the Internet for a brief period after the offense does not permit a reasonable conclusion that the post was created by defendant or on his behalf. See *Vayner*, 769 F.3d at 132.

¶ 118    The ease in fabricating a social media account to corroborate a story means that more than a "simple name and photograph" are required to sufficiently link the communication to the purported author under Rule 901. *Smith*, 2012-CT-00218-SCT (¶ 21). The court in *Tienda v. State*, 358 S.W.3d 633 (Tex. Crim. App. 2012), surveyed cases and noted that "something more" might be necessary to adequately present a *prima facie* case of authentication. *Smith*, 2012-CT-00218-SCT (¶ 21) (citing *Tienda*, 358 S.W.3d at 639-41). For example, (1) the purported sender admits authorship, (2) the purported sender is seen composing the communication, (3) business records of an Internet service provider or cell phone company show that the communication originated from the purported sender's personal computer or cell phone under circumstances in which it is reasonable to believe that only the purported sender would have had access to the computer or cell phone, (4) the communication contains information that only the purported sender could be expected to know, (5) the purported sender responds to an exchange in such a way as to indicate circumstantially that he was, in fact, the author of the communication, or (6) other circumstances peculiar to the particular case may suffice to establish a *prima facie* showing of authenticity. *Smith*, 2012-CT-00218-SCT (¶ 21)

(citing *Tienda*, 358 S.W.3d at 639-41). In *Smith*, the court held that "[t]he State failed to make a *prima facie* case that the Facebook profile from which the messages came belonged to Smith, as the only information tying the Facebook account to Smith was that the messages purported to be from a 'Scott Smith' and were accompanied by a very small, grainy, low-quality photograph that we can only assume purported to be Smith." *Smith*, 2012-CT-00218-SCT (¶ 24).[1]

¶ 119    These examples are intended only as a guide, and we emphasize that we express no view on what specific type and quantum of evidence would have been sufficient to authenticate the Facebook post and warrant its consideration by the jury. See *Vayner*, 769 F.3d at 133. "Evidence may be authenticated in many ways, and as with any piece of evidence whose authenticity is in question, the 'type and quantum' of evidence necessary to authenticate a web page will always depend on context." *Vayner*, 769 F.3d at 133. However, to argue that the Facebook post was tantamount to an admission that defendant killed the victim in his driveway, Rule 901 required "some basis" on which a reasonable juror could conclude that the post was not just any Internet post but was, in fact, created by defendant or at his direction. See *Vayner*, 769 F.3d at 133. Without such a showing, the trial court abused its discretion in admitting the Facebook post and Detective Beets's testimony.

¶ 120                                    3. Harmless Error

¶ 121    The State's closing argument to the jury repeatedly emphasized the Facebook evidence. In fact, the prosecution began its argument as follows:

> "Good morning again, ladies and gentlemen. 'It's my way or the highway. Leave him dead in a driveway.' Someone who is just looking on Facebook and sees a post like that might be a little disturbed. Not sure what it really means. When Detective Beets saw that post on May 7th, 2013, he knew exactly what it meant. And today you all know what it meant. It was this defendant admitting to the fact that he shot Donmarquis Jackson on May 7, 2013, in his driveway and left him there to die that night."

¶ 122    The trial court abused its discretion in admitting the Facebook evidence and allowing the State to argue that the post was an admission by defendant that he committed the offense. Defendant argues that this error entitles him to a new trial, and perhaps recognizing the prejudicial effect, the State did not argue harmless error in its brief and conceded the point during oral argument. See *People v. Thurow*, 203 Ill. 2d 352, 363 (2003) (to establish that an error was harmless, the "State must prove beyond a reasonable doubt that the jury verdict would have been the same absent the error"). We agree with defendant that the error compels reversal of the conviction.

---

[1]In the authentication context, one must be mindful of the substantial risk of the false attribution of online content when admitting an image from a profile as evidence that its purported owner is responsible for the communication. Because the Internet has made personal information less private and it is so easy to digitally mine content and background information from social media and other sources, the resemblance of a profile's photograph to its purported owner is not definitive proof that he or she posted it.

¶ 123                                    4. Double Jeopardy

¶ 124        Our reversal of defendant's conviction raises the double jeopardy issue. The double jeopardy clause of the United States Constitution prohibits the State from having another opportunity to try a case unless it has in the first trial presented sufficient evidence to prove the defendant guilty beyond a reasonable doubt. *People v. Johnson*, 2013 IL App (2d) 110535, ¶ 84. Thus, before remanding for a new trial, double jeopardy requires the appellate court to rule upon the sufficiency-of-the-evidence issue. *People v. Taylor*, 76 Ill. 2d 289, 309 (1979); *Johnson*, 2013 IL App (2d) 110535, ¶ 84. As discussed, we have carefully reviewed the record in the light most favorable to the prosecution and concluded that the evidence sufficiently supports the verdict beyond a reasonable doubt. Our determination, however, is not binding on retrial and does not indicate this court's opinion as to defendant's guilt or innocence.

¶ 125                                    C. Phone Records

¶ 126        Though no longer dispositive of this appeal, we mention defendant's argument that the trial court abused its discretion in admitting (1) computer-generated records of Mikayla's phone without an adequate foundation and (2) hearsay evidence linking these records to Donmarquis. The State used the phone records and the corresponding testimony to show that calls were placed between Mikayla's phone and one allegedly belonging to Donmarquis.

¶ 127        The phone records for 779-***-2350 showed that the phone associated with that number was registered to Mikayla. Attached to these records was a certificate stating that they: "(a) [w]ere made at or near the time of the occurrence of the matters set forth in the records by, or from information transmitted by a person with knowledge of those matters; (b) [w]ere kept in the course of a regularly conducted business activity; and (c) [w]ere made by the regularly conducted activity as a regular practice."

¶ 128        Computer-generated records are the spontaneously created tangible results of the internal electrical and mechanical operations of a computer itself, which are not dependent upon the observations and reporting of a human declarant. Billing data generated instantaneously by a computer when a telephone call is made, such as the data introduced in this case, is an example of a computer-generated record. See *People v. Holowko*, 109 Ill. 2d 187, 191-93 (1985).

¶ 129        Illinois courts have consistently held that, to establish an adequate foundation for a computer-generated record as a business record, the proponent must make two showings. First, he or she must show that (1) the record was made as a memorandum or record of the act, (2) the record was made in the regular course of business, and (3) it was the regular course of the business to make such a record at the time of the act or within a reasonable time thereafter. *People v. Nixon*, 2015 IL App (1st) 130132, ¶ 110; Ill. R. Evid. 803(6) (eff. Jan. 1, 2011). Second, the proponent must show that standard equipment was used; the particular computer generates accurate records when used appropriately; the computer was used appropriately; and the sources of the information, the method of recording, and the time of preparation indicate that the record is trustworthy and should be admitted into evidence. *Nixon*, 2015 IL App (1st) 130132, ¶ 111.

¶ 130        Defendant argues that, although the certificate associated with Mikayla's phone records met the first requirement to establish it as a business record, the State did not meet the second requirement of authenticating it as computer-generated evidence. The State tacitly concedes error by quoting *Nixon* for the proposition that "such an 'evidentiary error does not serve as a reason to overturn a jury verdict, if other properly admitted evidence is overwhelming.' "

*Nixon*, 2015 IL App (1st) 130132, ¶ 120. The State argues that any error regarding the phone records was harmless. If the issue arises at the new trial, the State must lay an adequate foundation for all computer-generated records to be admitted.

¶ 131 Defendant also argues that the court erred in allowing Detective Swanson to testify to Donmarquis's two cell phone numbers. Defendant argues that the detective's testimony was impermissible hearsay. At trial, the detective testified that Doris gave him the numbers, but he did not recall them and had to refresh his recollection from his police report, where he recorded what Doris had told him. One of the numbers he subpoenaed as Donmarquis's was 773-***-5921, which was assigned to a phone that allegedly had communicated with Mikayla's phone in the hours leading up to the murder.

¶ 132 " 'Hearsay' is a statement, other than one made by the declarant while testifying at the trial or hearing, offered in evidence to prove the truth of the matter asserted." Ill. R. Evid. 801(c) (eff. Jan. 1, 2011). Hearsay is not admissible unless it falls within a recognized exception. Ill. R. Evid. 802 (eff. Jan. 1, 2011); *People v. Cloutier*, 178 Ill. 2d 141, 154 (1997). Although a trial court's evidentiary rulings generally are reviewed for an abuse of discretion (*People v. Caffey*, 205 Ill. 2d 52, 89 (2001)), a ruling on whether a statement is hearsay may be reviewed *de novo* when the determination does not involve fact finding or weighing the credibility of the witnesses. *People v. Steele*, 2014 IL App (1st) 121452, ¶ 34. Defendant raises a valid issue that Detective Swanson's testimony about what Doris told him was offered for the truth of the matter asserted: that Donmarquis's phone number was 773-***-5921. To submit this evidence to the jury on remand, the State must lay an adequate foundation.

¶ 133                                    III. CONCLUSION

¶ 134 For the reasons stated, we reverse defendant's conviction of first degree murder and remand the cause for a new trial.

¶ 135 Reversed and remanded.