THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, v.
ARYULES BIVENS; Defendant-Appellant.

First District (5th Division)   No. 85—0673

Opinion filed May 29, 1987.

Joshua Sachs, of Chicago, for appellant.

Richard M. Daley, State's Attorney, of Chicago (Thomas V. Gainer, Jr., Paula Carstensen, and Eugene Hollander, Assistant State's Attorneys, of counsel), for the People.

PRESIDING JUSTICE SULLIVAN delivered the opinion of the court:

Following a jury trial, defendant was convicted of one count of escape (Ill. Rev. Stat. 1985, ch. 38, par. 31—6(a)), one count of possession of a stolen vehicle (Ill. Rev. Stat. 1985, ch. 95½, par. 4—103(a)(1)), 10 counts of armed robbery (Ill. Rev. Stat. 1985, ch. 38, par. 18—2(a)), and five counts of unlawful restraint (Ill. Rev. Stat. 1985, ch. 38, par. 10—3(a)). He was sentenced to maximum extended terms of 14 years for escape, 10 years for possession of the stolen vehicle, and 50 years on each of the 10 counts of armed robbery, all to run concurrently to each other but consecutively to the natural-life and 60-year sentences he was then serving on previous convictions of murder and armed robbery. No sentences were imposed on the unlawful restraint convictions, the trial court having determined that they merged with those for armed robbery. On appeal, he contends that (a) the trial court erred in refusing to instruct the jury on the defense of necessity, (b) his conviction for possession of a stolen vehicle was not supported by the evidence, and (c) the trial court abused its discretion in sentencing him to maximum extended terms of imprisonment.

The incident out of which the charges arose was the escape on March 23, 1984, by defendant and five other inmates from the maximum security division of the Cook County jail, where defendant was being held while awaiting trial on another armed robbery charge. He was apprehended in an apartment on the south side of Chicago on March 27, 1984, and charged with the offenses enumerated above. The evidence reconstructing the facts of this case was presented at a week-long trial through the testimony of 34 witnesses, which we have reviewed in its entirety but will discuss only to the extent that it directly relates to the issues raised.

OPINION
■ ■ Defendant first contends that the trial court improperly refused to instruct the jury on the statutory defense of necessity, arguing that where "some evidence" is presented in support thereof, it is error to refuse a tendered instruction thereon. *People v. Unger* (1977), 66 Ill. 2d 333, 362 N.E.2d 319. ·

In defense of the charges, defendant affirmatively asserted both (1) that he was initially compelled to participate in the preliminary escape activities by the other inmates because he was familiar with the tunnel system in the jail through which they planned to exit the complex, having once been assigned to a work detail transporting supplies between divisions by way of the tunnels, and (2) that his continued participation, ultimate escape and failure to thereafter surrender were necessitated by fear of physical retaliation against him by the guards. The trial court instructed the jury on the definition of compulsion, but refused the instruction tendered by defendant on the legal concept of necessity.

The defense of necessity is a statutorily recognized affirmative defense, codified in section 7—13 of the Code of Criminal Procedure of 1963 (Ill. Rev. Stat. 1985, ch. 38, par. 7—13) (the Code), which provides:

> "Conduct which would otherwise be an offense is justifiable by reason of necessity if the accused was without blame in occasioning or developing the situation and reasonably believed such conduct was necessary to avoid a public or private injury greater than the injury which might reasonably result from his own conduct."

The defense of compulsion is also a statutory affirmative defense, codified in section 7—11(a) of the Code (Ill. Rev. Stat. 1985, ch. 38, par. 7—11(a)), which states:

> "A person is not guilty of an offense, other than an offense punishable by death, by reason of conduct which he performs under the compulsion of threat or menace of the imminent infliction of death or great bodily harm, if he reasonably believes death or great bodily harm will be inflicted upon him if he does not perform such conduct."

Defendant is correct in his assertion that while the terms are sometimes used interchangeably, compulsion and necessity are theoretically distinct defenses. Compulsion implies a complete deprivation of free will, *i.e.*, an absence of choice, whereas necessity involves a choice between two or more admitted evils (*People v. Unger* (1977), 66 Ill. 2d 333, 362 N.E.2d 319; *People v. Whitson* (1984), 127 Ill. App. 3d

999, 470 N.E.2d 1054; *People v. White* (1979), 78 Ill. App. 3d 979, 397 N.E.2d 1246). We are also cognizant of the well-settled proposition that a defendant is entitled to appropriate instructions on any legally recognized affirmative defense on which he has presented "some evidence." (Ill. Rev. Stat. 1985, ch. 38, par. 3—2; *People v. Unger* (1977), 66 Ill. 2d 333, 362 N.E.2d 319; *People v. Roberts* (1985), 136 Ill. App. 3d 863, 483 N.E.2d 1328.) As noted above, the instruction tendered by defendant on compulsion was given but his instruction on necessity was refused; thus, the only question for our review on this issue is whether the evidence introduced by defendant in support of the defense of necessity was sufficient to warrant a jury instruction thereon.

At trial, defendant testified that the maximum security division of the jail, referred to as "ABO," contained 19 one-man cells, a common-area dayroom used primarily for recreation and a control room, enclosed by bars, from which the guards were able to observe the inmates and electronically lock and unlock the individual cells. Between 8 a.m. and 6 p.m., the inmates were allowed in the dayroom as a group, but after 6 p.m. they were released from their cells in three-man, two-hour shifts.

Among the 10 or 11 other inmates then housed in ABO were Reginald Mahaffey and his brother, Jerry Mahaffey, Brian Daniels, Raymond Greer, Gregory Hill, and five other men he knew as Emerson, Franklin, Freeman, "Preacher," and Rick. None of these men were his friends, but he particularly disliked and feared the Mahaffey brothers because they were "bullies" and "very rough," having taken his personal possessions and attempting to initiate fights with him on several occasions. The day-shift guards were strict and sometimes brutal in their manner of treating and speaking to the inmates. On one occasion, five or six guards beat and broke the arm of an inmate who had responded to their insults with a threat. In contrast, the night-shift guards, including Cook County sheriff's officers Bottigliero, Regan and Riley, were generally friendly and more fair and "relaxed" in their treatment of the prisoners.

At 8 p.m. on Friday, March 23, 1984, he began his evening recreation shift, together with Hill and "Preacher," but because it was visitor's night in the division, several of the other inmates were also out of their cells during the same period. At approximately 8:45 he noticed Officers Bottigliero and Regan conversing in the control room and then sat down with his back to the cell area to watch television. A few minutes later, he heard the "loud, banging" noise that occurred each time the door leading out of the dayroom was unlocked, but then

also heard several footsteps and the voices of Daniels, Hill and Reginald Mahaffey, saying, "Get over there." Mahaffey approached him with a gun and said, in essence, "You're going with us. You're going to show us the way out," and then grabbed him by the shoulder and led him toward the control room where Greer, Daniels and Hill were with Officer Bottigliero, who was removing his uniform and giving it to Hill. Officer Langdon, who had just entered the doorway from the outer hall, was pulled into the control room at gunpoint by Daniels and also ordered to remove his uniform. Before putting on Langdon's uniform Daniels gave the gun to Jerry Mahaffey, who used it to force Officer Regan into a cell. Upon Mahaffey's return, Officer Riley entered the control room doorway holding a cup of coffee. Mahaffey pulled Riley inside and toward the dayroom, where he and Reginald Mahaffey were still standing. Riley was ordered by the Mahaffeys to give him (defendant) his uniform, whereupon he and Riley moved toward the corner of the dayroom. Riley was very agitated and, as he undressed, repeatedly asked what they were doing and what they wanted. In response, he advised Riley to "cool out" and told him, "Nobody is going to hurt you. I don't even want to be in this myself." Riley then relaxed somewhat and said, "Well, man, you know if you don't go, we are going to kick ass after this anyway, you know." It was at that point, after recalling past occasions of guard brutality, that he quickly decided that he would put on Riley's uniform and attempt to escape with the other inmates. After Bottigliero, Langdon, and Riley were locked in cells by Daniels and the Mahaffeys, Reginald Mahaffey led him back to the control room, at which point Greer asked why he was being taken along, to which Mahaffey replied, "He got to show us the way out."

The inmates then proceeded down "the boulevard"—a central hallway—to a security area referred to as "Post 78," where a fight erupted between Hill and one of the guards in the security office. While the other escapees entered the office to subdue the officers therein, he continued down the hallway to the basement tunnel, and took an elevator up to the first floor, emerging near a guarded double-door "interlock" exit. At first, he panicked, but a few minutes later Hill came out of an elevator and warned him to "cool it unless you want to get us killed." They walked down the hallway and showed the female guard in the booth the ABO officers' identification badges, after which she electronically opened the doors, allowing them passage out to "Post 10," a guard shack at the edge of the jail complex. In his panic, he started toward the fence, intending to climb over it, but Hill again warned him to "cool out." Continuing to pose

as sheriff's officers, they approached the shack and told the guard that someone was trying to steal Hill's car from where it was parked on the street outside the complex. After a brief conversation, the guard allowed them out of the gate leading to the street. They walked past about four houses and climbed over a fence which led to a dead-end street, where they saw some people standing near a double-parked car. They approached the car, identified themselves as police officers and told the woman in the driver's seat that they needed the car for a police emergency. When she and her children exited the vehicle, they got in, accompanied by the woman's brother, and drove it to an area on the south side of Chicago. Before departing, Hill warned him not to go to any friends' or relatives' homes because "if they [the police] catch you, they are going to kill you." He nevertheless went to the home of a former neighbor, told her that he had just done something he "was not proud of," *i.e.*, that he escaped from jail, and asked her for some clothes and the use of her telephone. Shortly thereafter, he learned from newspapers and television reports that Brian Daniels had been stabbed in the jail following his recapture and that Reginald Mahaffey, who was apprehended before escaping, had jumped out of a second-story window while his hands were cuffed behind his back. It was his belief that the police had thrown or pushed Mahaffey out of the window and that the stabbing of Daniels was also escape-related, and he feared that if he surrendered or was caught something similar, or worse, would be done to him. He remained in hiding until he was apprehended on March 27—four days after the escape.

Defendant argues that, if properly instructed, the jury reasonably could have found, from his testimony as to Riley's warning regarding the likelihood of physical reprisals after the escape, that (1) the fear instilled in him thereby was justified when considered in conjunction with his testimony regarding the beatings he had previously witnessed in the jail, the post-escape stabbing of one of the recaptured escapees, and Mahaffey's "fall" out of a second-story window and (2) that he therefore acted out of legal necessity in failing to withdraw from the enterprise or to voluntarily surrender once he was no longer under the threat of imminent harm from the other escapees.

Restated in a manner which incorporates the language of the statute, defendant's position is that he was without blame in occasioning or developing either the takeover of ABO or his own ultimate escape *and* that he reasonably believed that escaping from the jail, commandeering a neighborhood resident's automobile and thereafter going into hiding was necessary to avoid, or prevent, a harm to himself—

*i.e.*, possible physical retaliation by the guards for his participation in the incident—which was greater than the harm which might reasonably have resulted from those actions.

■ It is our view, however, that, even if believed, defendant's version of the incident—much of which was contradicted by the State's evidence—does not satisfy even the low standard of "some evidence" as to each of the elements set forth in the necessity statute which would entitle him to an instruction thereon.

With respect to the reasonableness of his conduct, we find first that defendant's reliance on *People v. Unger* (1977), 66 Ill. 2d 333, 362 N.E.2d 319, is wholly misplaced. In support of his necessity defense, Unger testified that he had been assaulted and homosexually molested by other inmates and that he thereafter received numerous anonymous death threats for having reported the incident to prison authorities and that it was his fear of further forcible sexual attacks and/or death which prompted him to escape. Questioning the credulity of defendant's additional testimony that he intended to return to the prison upon obtaining legal assistance from an attorney, the supreme court nevertheless found that his testimony constituted "some evidence" of necessity. In contrast, the sole reason offered by defendant for his initial decision to accompany the others out of the ABO unit and for his subsequent failure to withdraw from the escape or to report it to the various persons he passed in the hallway between the time he left the group during the altercation in the security office and the reappearance of Hill—who was at no time armed—on the first floor was Officer Riley's alleged statement that: "[Y]ou know if you don't go, we are going to kick ass after this anyway." In our opinion, this remark was neither specific enough to even rise to the level of a direct threat such as was present in *Unger* nor, in any event, so dire a warning as to reasonably instill in him the degree of fear of impending and serious bodily harm which he claims necessitated his actions. Indeed, in the light of defendant's testimony that he "got along well" with the night guards, whom he variously described as "friendly," "cool," and "fair," it is not unreasonable to assume that had defendant alerted authorities to the events occurring in ABO and thereby assisted in thwarting the escape, Officer Riley would have substantiated his assertion that he had been an unwilling participant, if it were true, which in all likelihood would have substantially lessened the possibility of any physical retaliation.

We further find unreasonable defendant's belief that the private injury he might suffer was greater than the harm which might reasonably result from his own conduct. First, even accepting his hypoth-

esis that there would be some physical retaliation against him and the other inmates who did not escape—which, as noted above, we consider a highly speculative assumption—it was admitted by defendant that he was aware and in constant fear that by reason of his participation in the escape, he might be killed either by prison guards or police officers attempting to prevent it and/or in a confrontation between the police and those escapees who were armed. Thus, merely from the standpoint of his own safety, defendant did not demonstrate that his chosen conduct was the lesser of the alternative evils he faced *at the time he made the decision to escape*, and, from the standpoint of the harm to the public, it is clear that by failing to alert authorities to the escape before it actually occurred, he was partly responsible for, *inter alia*, the grave danger to the citizenry posed by the reentry into the community of several convicts whom even he considered highly dangerous and the expenditure of vast amounts of public resources in the massive manhunt which followed.

Moreover, on the basis of the evidence in its entirety, we believe that it was implicit in the jury's rejection of defendant's claim that he was compelled by the threat of imminent death or great bodily harm which he reasonably believed would be inflicted by the other inmates if he did not participate in the takeover of and escape from ABO—on which they *were* instructed—that they did not consider him to have been entirely blameless in occasioning or developing the underlying "situation," and therefore could not have found his subsequent conduct excusable on the ground of necessity. *Cf. People v. Roberts* (1985), 136 Ill. App. 3d 863, 483 N.E.2d 1328 (having entered the premises armed with a handgun, defendant was not without blame in occasioning the situation which led to two shootings and, therefore, was not entitled to an instruction on necessity); *People v. Whitson* (1984), 127 Ill. App. 3d 999, 470 N.E.2d 1054 (defendant's presence in a prison unit allowing fewer privileges than those provided to the general prison population was a result of his own prior conduct, and thus, he was not without blame in occasioning his situation so as to excuse his part in an inmate takeover of the unit).

■ Defendant next contends that the evidence did not support his conviction for possession of a stolen motor vehicle under section 4—103(a)(1) of the Illinois Vehicle Code (Ill. Rev. Stat. 1983, ch. 95½, par. 4—103(a)(1)), which provides that "it is a violation of this Chapter for *** a person not entitled to the possession of a vehicle *** to receive, possess, conceal, sell or dispose of it, knowing it to have been stolen or converted."

Citing *People v. Cramer* (1981), 85 Ill. 2d 92, 421 N.E.2d 189, he

syllogizes that where, as here, the indictment charges possession of a "stolen," as opposed to a "converted," motor vehicle, it must be shown that a "theft" occurred, an essential element of which is the intent to permanently deprive the owner of the use and benefit of the vehicle, and that the evidence in this case established that (a) his use of the car was authorized by the owner, (b) an agent of the owner was present throughout the period of possession, and (c) the vehicle was subsequently returned to the owner with payment for its use.

In *Cramer*, the defendant was charged with the theft of a truck having a value of more than $150. Although he admitted that he took and drove the truck, there was some evidence that he intended to return it. On appeal, he asserted that the conflict regarding his mental state in taking the car entitled him to an instruction on section 4–103(a) on the ground that possession of a stolen motor vehicle is a lesser included offense of theft. Rejecting this argument, the court ruled that the instruction was properly refused, stating that the term "stolen" in section 4–103(a) "obviously refers to a 'theft,' " and that, therefore, facts on which the jury could have found him guilty of possession of a stolen vehicle were the same ones necessary to convict him of theft.[1] 85 Ill. 2d 92, 100, 421 N.E.2d 189.

While the facts and issue before us differ from those presented in *Cramer*, we believe that by limiting the charge in the indictment to possession of a "stolen" vehicle, rather than of a "converted" vehicle, the State was obliged, under the holding in *Cramer*, to prove not only that defendant's possession of the vehicle was unauthorized, but also that he intended or knowingly exerted control of the property in such a manner as to permanently deprive the owner of its use and benefit.[2]

At trial, the State called as witnesses Norma Bedolla, her brother, Alejandro Rubio, and Rubio's fiancee, Christine Leal, who variously testified, in substance, that on the night of the escape two men dressed in deputy sheriff's uniforms—one of whom was defendant—ran up to them as they were gathered in and near the automobile owned by Bedolla's husband and stated that they needed the car for "police business." According to Leal, after Bedolla and her children exited the vehicle, defendant's companion ordered her (Leal) to move out of the way or he would kill her and slammed her arm with the car door as he entered the front seat. Concerned that the car did not run

---

[1]The reasoning in *Cramer* is consistent with section 15–6 of the Code, which defines "stolen property" as that "over which control has been obtained by theft." Ill. Rev. Stat. 1985, ch. 38, par. 15–6.

[2]It appears that the indictment included two counts of theft, but that the charges were subsequently withdrawn on the State's motion.

well and that Bedolla's husband would be angry with her if anything happened to it, Rubio got into the back seat before the men drove away. During the drive to an area on the south side of the city, the men informed Rubio that they had just escaped from jail. A few blocks past the Museum of Science and Industry, they pulled the car over and Hill got out. Defendant explained that Hill was checking on his wife to find out if she was cheating on him. A short time later, Hill returned to the car and told defendant to come with him. Both men then left, after which Rubio started the car and drove toward his home. He was stopped on the way by policemen who had their weapons drawn and at that time explained to them what had occurred. Rubio further testified that until defendant and Hill told him otherwise, it did not occur to him that they were not guards and that neither of them ever displayed a weapon or otherwise hurt or threatened him. Defendant's version of the events was substantively the same, except that he claimed to have given Rubio money for gasoline before leaving the car. Defense counsel's tendered instructions defining the offense of theft were refused.

Initially, it should be noted that we find no merit to defendant's assertion that his use of the car was authorized by the owner or with the owner's consent, since he and Hill obtained Bedolla's "consent" only by falsely representing themselves to be police officers, needing the car for "official police business." However, we are constrained to agree that the evidence, as summarized above, was insufficient to prove beyond a reasonable doubt that defendant exerted control of the car with the intent to or knowledge that his actions would permanently deprive the owner of its use and benefit as was made necessary by charging defendant with "only possession of a 'stolen' motor vehicle." We therefore reverse defendant's conviction and vacate the sentence imposed for possession of a stolen motor vehicle.

■ Defendant's final contention is that the imposition of maximum extended-term sentences was improper because (a) contrary to the trial court's findings, neither of the factors on which the court relied in determining him eligible for extended sentences was present in this case, and (b) the court erroneously considered an inapplicable factor in aggravation.

Section 5—8—2 of the Unified Code of Corrections (Ill. Rev. Stat. 1985, ch. 38, par. 1005—8—2) provides:

"Extended Term. (a) A judge shall not sentence an offender to a term of imprisonment in excess of the maximum sentence authorized by Section 5—8—1 for the class of the most

serious offense of which the offender was convicted unless the factors in aggravation set forth in paragraph (b) of Section 5—5—3.2 were found to be present."
Those of the factors enumerated in section 5—5—3.2(b) (Ill. Rev. Stat. 1985, ch. 38, par. 1005—5—3.2(b)) relevant to the case before us are:

"(1) When a defendant is convicted of any felony, after having been previously convicted in Illinois of the same or greater class felony, within 10 years, excluding time spent in custody, and such charges are separately brought and tried and arise out of different series of acts; or

* * *

(3) When a defendant is convicted of any felony committed against: *** (ii) a person 60 years of age or older at the time of the offense ***."

Following testimony and argument by counsel at the sentencing hearing, the court reviewed the statutory factors in mitigation and aggravation and stated, *inter alia*, that "all the elements of Factor 1 [referring to section 5—5—3.2(b)(1)] are fulfilled," in that "the defendant was convicted of another felony after having been previously convicted in Illinois of the same or greater in class felony within ten years, and such charges are separately brought and tried and arise out of a different series of events. Obviously that factor is yes."

As to this finding, it is defendant's position that "[i]f the court meant to refer only to a prior conviction for armed robbery which was imposed in 1980 there may be no impropriety"; but that it appears that the court also considered his convictions for murder and armed robbery, which arose "out of conduct which took place prior to, not after, his conviction in the murder case." He maintains that "the escape and related incidents all occurred while [he] was in custody on the murder charge, awaiting trial," and that section 5—5—3.2(b)(1) therefore does not apply.

In response, the State asserts only that "the court could impose the extended term upon the defendant, though the instant offenses occurred prior to his conviction of murder and armed robbery," citing *People v. Hamilton* (1980), 81 Ill. App. 3d 297, 401 N.E.2d 318, as dispositive thereof.

We need not, however, engage in a lengthy discussion regarding the legal positions taken by parties as to the interpretation of the language "after having been previously convicted in Illinois of the same or greater class felony" in section 5—5—3.2(b)(1)—which ap-

pears to be the basis of defendant's argument—since our examination of the record discloses that the premise upon which the arguments are based is factually incorrect.

The record reveals that on January 5, 1983, following a police chase, defendant was apprehended in a stolen car and thereafter charged with armed robbery, unlawful restraint and armed violence. While in custody on those charges, defendant was additionally charged with the September 12, 1982, murder and armed robbery of a deaf mute. On August 8, 1983, defendant was found guilty of the murder and armed robbery and, on September 8, 1983, was sentenced to consecutive terms of natural-life and 60 years' imprisonment, respectively, therefor. As of the date of the escape—March 23, 1984—defendant was still awaiting trial on the armed robbery charge arising out of the events on January 5, 1983, and it was for that reason that he was being held in the Cook County correctional facility. Thus, his assertion that the imposition of extended terms on the 10 counts of armed robbery in this case were improper because they "arose out of conduct which took place prior to—not after—his conviction in the murder case" is patently erroneous. Furthermore, as defendant seemingly concedes, his 1980 conviction for armed robbery in itself qualified him, under section 5—5—3.2(b)(i), for an extended sentence. In the light thereof, we need not consider defendant's arguments as to whether (a) the evidence supported the trial court's additional finding that he was eligible for extended terms under section 5—5—3.2(b)(iii) on the ground that "some of the guards were over the age of 60". or (b) that provision was inapplicable where the offense was committed against law-enforcement officers while they were acting in the line of duty.

We do, however, agree—and the State apparently concedes—that the court improperly reasoned that "this was not only an escape, but a robbery for hundreds and hundreds of dollars," in finding as an aggravating factor under section 5—5—3.2(a)(2) that he "received compensation for committing the offense" (Ill. Rev. Stat. 1985, ch. 38, par. 1005—5—3.2(a)(2)). As the supreme court stated in *People v. Conover* (1981), 84 Ill. 2d 400, 419 N.E.2d 906, in a discussion of the same issue in consolidated cases involving burglary and theft, "[i]nasmuch as most burglaries and every theft involve proceeds, it is reasonable to conclude that the legislature already considered that factor in establishing the penalties. If the General Assembly had intended that proceeds be utilized again to impose a more severe penalty for those offenses, such intent would be more clearly expressed. Consequently, we believe receiving compensation for committing the

offense under the statute applies only to a defendant who receives remuneration other than proceeds from the offense itself, to commit a crime." 84 Ill. 2d 400, 405, 419 N.E.2d 906, 909.

■ Finally, we exercise our authority under the doctrine of "plain error" (87 Ill. 2d R. 615), to consider an issue not raised by defendant. It has been settled by our supreme court in *People v. Jordan* (1984), 103 Ill. 2d 192, 469 N.E.2d 569, reaffirming its decision in *People v. Evans* (1981), 87 Ill. 2d 77, 429 N.E.2d 520, that under the plain language of section 5—8—2(a) (Ill. Rev. Stat. 1983, ch. 38, par. 1005—8—2(a)), where a defendant has been convicted of multiple offenses of differing classes, an extended-term sentence may only be imposed for the conviction within the most serious class. Here, defendant received extended terms not only on the 10 convictions of armed robbery—a Class X felony—but also the maximum extended terms on his convictions for escape and possession of a stolen vehicle—Class 2 and 3 felonies, respectively. Thus, in addition to our determination that defendant's conviction for possession of a stolen vehicle must be reversed and his sentence therefor vacated, we find that the trial court's improper imposition of multiple extended-term sentences for both armed robbery and escape, as well as its consideration of inapplicable factors in aggravation, necessitates remandment of the case for a new sentencing hearing.

For the reasons stated, we affirm defendant's convictions for armed robbery and escape but reverse his conviction for possession of a stolen vehicle and remand the cause for resentencing in accordance with the principles enunciated herein.

*Affirmed in part; reversed in part and remanded for further proceedings.*

LORENZ and MURRAY, JJ., concur.