# Illinois Official Reports

## Appellate Court

---

**People v. Brand, 2020 IL App (1st) 171728**

---

| | |
|---|---|
| Appellate Court Caption | THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, v. CROSETTI BRAND, Defendant-Appellant. |
| District & No. | First District, Fifth Division<br>No. 1-17-1728 |
| Filed | March 13, 2020 |
| Decision Under Review | Appeal from the Circuit Court of Cook County, No. 15-CR-20441; the Hon. Stanley J. Sacks, Judge, presiding. |
| Judgment | Affirmed and remanded; mittimus corrected. |
| Counsel on Appeal | James E. Chadd, Patricia Mysza, and Joseph Michael Benak, of State Appellate Defender's Office, of Chicago, for appellant.<br><br>Kimberly M. Foxx, State's Attorney, of Chicago (Alan J. Spellberg, Daniel Pwowarcyzk, and Caitlin Costa, Assistant State's Attorneys, of counsel), for the People. |
| Panel | JUSTICE ROCHFORD delivered the judgment of the court, with opinion.<br>Presiding Justice Hoffman and Justice Delort concurred in the judgment and opinion. |

**OPINION**

¶ 1      Following a bench trial, defendant, Crosetti Brand, was convicted of aggravated domestic battery, home invasion, and possession of a stolen or converted motor vehicle. The trial court sentenced defendant to 16 years' imprisonment for home invasion (merged with aggravated domestic battery) to be served concurrently with 3 years' imprisonment for possession of a stolen or converted motor vehicle. The court also entered an order of protection on behalf of the victim against defendant, set to expire two years after defendant's release from prison. Defendant appeals, contending (1) the trial court erred by admitting evidence regarding the contents of two Facebook messages that defendant allegedly sent to the victim; (2) the State failed to prove him guilty beyond a reasonable doubt of possession of a stolen or converted motor vehicle; (3) the trial court erred by admitting photographs of the victim's car keys allegedly recovered from defendant and inventoried by the police, where the State failed to present a sufficient chain of custody; (4) the court erred by failing to conduct an inquiry under *People v. Krankel*, 102 Ill. 2d 181 (1984), regarding his posttrial allegations of ineffective assistance of counsel; (5) the court erroneously considered improper factors during sentencing; (6) the order of protection should be vacated because it was entered in contravention of the statutory requirements; and (7) the mittimus should be corrected to accurately reflect that he was convicted of home invasion under section 19-6(a)(2) of the Criminal Code of 2012 (Criminal Code) (720 ILCS 5/19-6(a)(2) (West 2014)) instead of under section 19-6(a)(3) (*id.* § 19-6(a)(3)). We affirm defendant's convictions and sentence, remand for a *Krankel* hearing, and correct the mittimus.

¶ 2      At trial, the victim, Anita Shannon, testified that defendant was her ex-boyfriend and that they had dated about two years, until she ended the relationship on October 30, 2015. On November 3, 2015, four days after she ended their relationship, defendant showed up at her place of employment to speak with her. Ms. Shannon told defendant that she did not want to talk to him anymore.

¶ 3      Later that evening, at about 7:15 p.m., Ms. Shannon was in her apartment preparing dinner for her four children when defendant knocked on the door. She opened the door about six inches and told defendant that she no longer wanted to be with him. Defendant told her that she needed "to come with a better answer than that." Ms. Shannon closed the door.

¶ 4      Defendant knocked on the door again. Ms. Shannon reopened the door just enough to "peek out" and told defendant that if he did not leave her alone, she would call the police on him. Defendant then pushed the door open, barged in, locked the door behind him, and put a gun to her chin. Defendant grabbed Ms. Shannon by the shirt collar, pushed her up against the wall next to the bathroom door, and began choking her.

¶ 5      Ms. Shannon's 15-year-old son, Maurice, stepped forward and asked defendant what he was doing. Defendant told Maurice to "get back," and pointed the gun at him. Defendant eventually dragged Ms. Shannon into Maurice's room, banged her head against a dresser, and threw her to the ground. Then defendant ran into Ms. Shannon's bedroom, from where she heard the sound of keys jingling. Defendant exited the bedroom and fled the apartment. Ms. Shannon got up and locked the door behind him. She looked out the window and saw that her car, a 2014 Kia Sedona, was gone. Then she called 911.

¶ 6      On November 8, 2015, Ms. Shannon received a Facebook message from a person named "Masetti Meech." Ms. Shannon explained that "Masetti Meech" was a name that defendant

had used when he communicated with her on Facebook while they were dating. Accordingly, Ms. Shannon believed that when communicating via Facebook messenger with Masetti Meech on November 8, 2015, she was actually communicating with defendant.

¶ 7 In the November 8 message, Masetti Meech told Ms. Shannon the location on 64th Street where she could recover her 2014 Kia Sedona. Ms. Shannon subsequently went to that location and retrieved her vehicle using a spare key. The State did not introduce a copy of the November 8 Facebook message into evidence because Ms. Shannon had deleted it once her "mailbox [got] full."

¶ 8 On November 21, 2015, Ms. Shannon received another Facebook message from Masetti Meech, a photograph of which was admitted into evidence. Ms. Shannon read the contents of the message into evidence:

"This is just the beginning. Only if you know what's lined up for your people as well. 79, 37, 71st, 39, 42, workplace, 79 is today. I'm coming in from back way. See your brother and OG. Bullets don't have name on them. I will see you soon. I love the waiting game. I parked up and watch and wait. Your son not going to see 16. I see him at school."

¶ 9 Ms. Shannon testified as follows regarding the numbers listed in the November 21 Facebook message:

"Q. Now, you read a series of numbers, 79, what does that number mean to you?

A. That's where my mom stay.

Q. On 79th Street?

A. Yes.

Q. What's 37?

A. That's where my sister stay.

Q. 37th Street?

A. Yes.

Q. What about 71?

A. My other sister stay there.

Q And 39?

A. That's where my brother stays.

Q. And what's 42?

A. That's the main office to the workplace where I used to work."

¶ 10 On November 24, 2015, Ms. Shannon and her brother saw defendant walking on 39th Street near her brother's building. Ms. Shannon called 911 and her brother flagged down a police officer.

¶ 11 Later on November 24, 2015, Ms. Shannon went to the police station and spoke with a detective, who showed her a bag containing the car keys that defendant had taken from her bedroom. A photograph of the bag's contents was admitted into evidence over defendant's objection.

¶ 12 Maurice Bates testified that he lives with his mother, Ms. Shannon, and his three brothers and sisters. At about 7:15 p.m. on November 3, 2015, Maurice was in his bedroom when he heard a door slam and then saw defendant choking Ms. Shannon in the hallway outside of his

room. Maurice walked toward defendant, who then pointed a gun at Maurice and said, "Is this what you want?"

¶ 13    Defendant put the gun underneath Ms. Shannon's chin and dragged her into Maurice's bedroom. Defendant shoved Ms. Shannon to the floor and went into her bedroom and retrieved her car keys. Defendant then left the apartment. Maurice called 911 and handed the phone to Ms. Shannon to speak to the operator. Maurice looked out the window and saw that Ms. Shannon's car was gone.

¶ 14    On cross-examination, Maurice testified that he was at home when the police arrived in response to the 911 call but that he did not speak with the officers that evening. Maurice spoke with the officers a week later, on November 10, and told them what he had seen.

¶ 15    Officer Steve Austin testified that he arrested defendant at about 3:30 p.m. on November 24, 2015. A custodial search was performed on defendant, and personal property was taken off him and placed in a personal property bag. Officer Austin identified three photographs of a personal property bag as depicting the bag that contained the items recovered from defendant during his custodial search. Officer Austin did not state what the items were.

¶ 16    On cross-examination, Officer Austin admitted that he did not personally perform the custodial search of defendant and he does not remember whether he was present during the search.

¶ 17    On redirect-examination, Officer Austin stated that a custodial search is performed during "all arrests." The trial court then questioned Officer Austin as follows:

> "Q. When a guy comes into the lockup, it's normal to do a custodial search to see what the guy has on him; correct?
>
> A. Yes.
>
> Q. And then the stuff was inventoried in those three photographs?
>
> A. That was his personal property that was put in those bags and went in the lockup with him."

¶ 18    On recross-examination, Officer Austin stated that he did not know who performed the custodial search. The trial court then questioned Officer Austin:

> "Q. Where would this be done at, the custodial search?
>
> A. It could have been done on the street at the location of arrest. It could have been done in the station in the 2nd District tact office.
>
> Q. You don't recall where—
>
> A. No, I don't recall where it took place."

¶ 19    Defendant did not call any witnesses. The parties stipulated that Officer Donald Smith, who responded to the 911 call on November 3, 2015, would have testified that he created a case incident report based on what Ms. Shannon told him that night. Ms. Shannon told him that, when defendant entered her apartment, he pulled out a silver object that she believed to be a gun and hit her in the head with it. She witnessed defendant subsequently get into her car and drive away. The report does not mention any statement by Ms. Shannon that defendant pushed her head into a drawer or pointed his gun at her son Maurice.

¶ 20    The trial court convicted defendant on all counts. In finding defendant guilty of home invasion, the court ruled that the State had not proven beyond a reasonable doubt that defendant was armed at the time, as required for a conviction under section 19-6(a)(3) of the home

invasion statute (720 ILCS 5/19-6(a)(3) (West 2014)). Instead, the court found that the State had proven defendant's guilt under section 19-6(a)(2), which only required that defendant had intentionally injured the victim within the apartment, regardless of whether a firearm was involved. See *id.* § 19-6(a)(2). However, the sentencing order incorrectly states that defendant was convicted of home invasion under section 19-6(a)(3).

¶ 21    Prior to the hearing on his motion for a new trial, defendant informed the court that he wanted to file a *pro se* motion alleging that his counsel was ineffective. The court informed defendant that "you can file whatever you'd like to file and I will set it for a *Krankel* (102 Ill. 2d 181 (1984)) hearing," but no *Krankel* hearing was ever held.

¶ 22    The trial court denied defendant's motion for a new trial and sentenced him to 16 years in prison for home invasion and 3 years in prison for possession of a stolen or converted motor vehicle, to run concurrently. Defendant appeals.

¶ 23    First, defendant argues that the trial court erred by admitting evidence regarding the contents of the November 8 and November 21 Facebook messages from Masetti Meech without proper authentication. The parties agree that despite its digital nature, the Facebook messages qualify as documents for admissibility purposes. See *People v. Kent*, 2017 IL App (2d) 140917, ¶ 86 (treating a Facebook post like any other form of documentary evidence). The State must lay a proper foundation by authenticating the Facebook messages before presenting evidence regarding their contents. See Ill. R. Evid. 901 (eff. Jan. 1, 2011). Authentication may be made by direct or circumstantial evidence, which is routinely the testimony of a witness who has sufficient personal knowledge to satisfy the trial court that the item is, in fact, what its proponent claims it to be. *Piser v. State Farm Mutual Automobile Insurance Co.*, 405 Ill. App. 3d 341, 349 (2010); Ill. R. Evid. 901(a) (eff. Jan. 1, 2011).

¶ 24    "Circumstantial evidence of authenticity includes such factors as appearance, contents, substance, and distinctive characteristics, which are to be considered with the surrounding circumstances." *People v. Ziemba*, 2018 IL App (2d) 170048, ¶ 52. "Documentary evidence, therefore, may be authenticated by its contents if it is shown to contain information that would be known only by the alleged author of the document or, at the very least, by a small group of people including the alleged author." *Id.* The trial court's decision to admit evidence regarding the contents of the Facebook messages will not be reversed absent an abuse of discretion. *People v. Chromik*, 408 Ill. App. 3d 1028, 1046 (2011).

¶ 25    The State contends that defendant forfeited review by failing to raise a foundation/authentication objection to the evidence regarding the Facebook messages at trial. The State cites *People v. Watt*, 2013 IL App (2d) 120183, ¶ 46, which held that "[t]o preserve an error, an objection must be timely, meaning contemporaneous with the objectionable conduct, and the objecting party must identify the same basis for his objection that he will argue on appeal."

¶ 26    Review of the record indicates that there was no forfeiture here. When the State began questioning Ms. Shannon about the November 8 Facebook message from Masetti Meech, defendant immediately voiced a general objection, which the trial court overruled. When the State subsequently began questioning Ms. Shannon about the November 21 Facebook message from Masetti Meech, defendant immediately stated that he was "going to object to relevance" and "foundation as well." The trial court overruled the objection, stating, "She got a message from Masetti Meech. She knows him by the name on her Facebook account." Defendant subsequently argued in his posttrial motion that the court erred in admitting evidence of the

November 8 and November 21 Facebook messages over his objections. The trial court denied the posttrial motion.

¶ 27    This record indicates to us that the trial court was made aware of defendant's claim that the November 8 and November 21 Facebook messages from Masetti Meech were not properly authenticated because there was insufficient evidence that they actually came from him but that the court rejected that claim on the basis of Ms. Shannon's testimony that defendant previously had used the name Masetti Meech when messaging her on Facebook. Where, as here, the trial court clearly had the opportunity to review the same essential claim that is later raised on appeal, there is no forfeiture. *People v. Heider*, 231 Ill. 2d 1, 18 (2008).

¶ 28    We proceed to address defendant's argument that the November 8 and November 21 Facebook messages were not properly authenticated. *Kent*, 2017 IL App (2d) 140917, is informative. In *Kent*, the defendant was charged with the first degree murder of the victim, Donmarquis Jackson, who was shot in the driveway of his residence. *Id.* ¶¶ 3, 4. At trial, Detective Beets testified that the day after the murder, he searched Facebook and found a profile under the name " 'Lorenzo Luckii Santos' " that contained a photograph of a person resembling the defendant. *Id.* ¶ 57. The Santos profile contained a post reading " 'its my way or the highway…leave em dead n his driveway.' " *Id.* Detective Beets testified that the profile name " 'Lorenzo Luckii Santos' " was " 'associated' " with this post, and he printed a screenshot of it. *Id.* The detective provided no testimony regarding when the post was created, but he testified that the post was deleted later that same day. *Id.*

¶ 29    Following Detective Beets's testimony, the defendant objected to the Facebook evidence, arguing that the State had failed to provide sufficient authentication. *Id.* ¶ 58. The trial court overruled the objection, finding that the Facebook post was sufficiently authenticated with the profile name, the photograph of the person resembling defendant, and the statement about leaving someone " 'dead n his driveway.' " *Id.* ¶¶ 57-58.

¶ 30    After he was convicted and sentenced, the defendant appealed, arguing that the trial court abused its discretion in admitting the Facebook post, as it was not properly authenticated. *Id.* ¶ 66. On review, the appellate court noted that " 'The authentication of social media poses unique issues regarding what is required to make a *prima facie* showing that the matter is what the proponent claims.' " *Id.* ¶ 105 (quoting *Smith v. State*, 2012-CT-00218-SCT (¶ 19) (Miss. 2014)). "[C]oncern over authentication arises because anyone can create a fictitious account and masquerade under another person's name or can gain access to another's account by obtaining the user's username and password, and consequently, the potential for fabricating or tampering with electronically stored information on a social networking website is high and poses challenges to authenticating printouts from the website." *Id.* ¶ 106.

¶ 31    Citing a Texas case (*Tienda v. State*, 358 S.W.3d 633 (Tex. Crim. App. 2012)), which surveyed cases addressing the authentication of various forms of electronically stored information, the appellate court held that the following factors were relevant for determining whether a social media post was properly authenticated:

> "(1) the purported sender admits authorship, (2) the purported sender is seen composing the communication, (3) business records of an Internet service provider or cell phone company show that the communication originated from the purported sender's personal computer or cell phone under circumstances in which it is reasonable to believe that only the purported sender would have had access to the computer or cell phone, (4) the communication contains information that only the purported sender could be expected

- 6 -

to know, (5) the purported sender responds to an exchange in such a way as to indicate circumstantially that he was, in fact, the author of the communication, or (6) other circumstances peculiar to the particular case may suffice to establish a *prima facie* showing of authenticity." *Kent*, 2017 IL App (2d) 140917, ¶ 118.

¶ 32 The appellate court noted that these examples "are intended only as a guide" and that " '[e]vidence may be authenticated in many ways, and as with any piece of evidence whose authenticity is in question, the "type and quantum" of evidence necessary to authenticate a web page will always depend on context.' " *Id.* ¶ 119 (quoting *United States v. Vayner*, 769 F.3d 125, 133 (2d Cir. 2014)).

¶ 33 Turning to the facts before it, the appellate court noted that the State offered neither direct nor circumstantial proof of authentication. *Id.* ¶ 103. Defendant did not admit making the post or creating the Facebook profile, and nobody saw him composing the post. *Id.* At the pretrial hearing, the State represented that the computer from which the Facebook post originated would have an Internet protocol (IP) address belonging to defendant's girlfriend, but no such evidence was presented at trial. *Id.* The State offered no evidence that any of the information in the Facebook post "was known or available only to defendant or, at the very least, to a small group of people including defendant." *Id.* ¶ 116. Also, "the State offered no evidence that defendant ever accessed Facebook or even used the Internet. At best, the photograph and the name on the Facebook profile are *about* defendant and not evidence that defendant himself had created the post or was responsible for its contents." (Emphasis in the original.) *Id.* ¶ 111. Accordingly, the appellate court held that without some basis from which a reasonable juror could conclude that the Facebook post was "not just any Internet post but was, in fact, created by defendant or at his direction," the trial court abused its discretion by admitting the Facebook post and Detective Beets's testimony. *Id.* ¶ 119.

¶ 34 In the present case, in contrast to *Kent*, the State presented sufficient evidence authenticating the November 8 and November 21 Facebook messages from Masetti Meech such that the trial court reasonably could conclude that both messages were created by defendant. Specifically, contrary to *Kent* in which the State there presented no evidence that the defendant ever accessed Facebook or even used the Internet, Ms. Shannon testified here that while they were dating, defendant messaged her on Facebook multiple times under the username "Masetti Meech." Based on defendant's repeated use of the username Masetti Meech when messaging her on Facebook, Ms. Shannon believed that the November 8 and November 21 Facebook messages from Masetti Meech actually came from defendant.

¶ 35 Also unlike *Kent*, in which the State offered no evidence that any of the information in the Facebook post was known or available only to defendant, or at the very least, to a small group of people including defendant, the State here provided evidence that the November 8 Facebook message contained unique information that was not widely known to persons other than defendant and Ms. Shannon. Specifically, the November 8 Facebook message from Masetti Meech informed Ms. Shannon about the location of her stolen car, which she subsequently retrieved. Ms. Shannon testified that defendant was the person who had stolen her car five days earlier; as such, defendant was in the unique position of knowing where he had disposed of the vehicle. The trial court reasonably could conclude that defendant was the author of the November 8 Facebook message from Masetti Meech to Ms. Shannon, which accurately informed her of the location of her stolen vehicle.

¶ 36    The State also provided evidence that the November 21 Facebook message contained unique information known at the very least to a small group of people, including defendant. Specifically, the November 21 Facebook message from Masetti Meech to Ms. Shannon contained threats to shoot "your people," including her son, who was "not going to see 16," and stated "79, 37, 71st, 39, 42, workplace, 79 is today." Ms. Shannon explained that "79" represented 79th Street where her mother lives, "37" represents 37th Street where her sister lives, "71" represents 71st Street where her other sister lives, "39" represents 39th Street where her brother lives, and "42" represents "the main office to the workplace where [she] used to work." The author of the November 21 Facebook message thus knew the age of Ms. Shannon's son, as well as the address of Ms. Shannon's place of work, and the residential addresses of her mother, brother, and two sisters. The totality of this information logically would have been known, at best, only to a small group of people close to Ms. Shannon, including defendant, her ex-boyfriend of two years.

¶ 37    The trial court reasonably could conclude that defendant authored the November 21 Facebook message from Masetti Meech, based on all the following evidence: (1) Masetti Meech was the user name associated with defendant's previous Facebook messages to Ms. Shannon while they were dating; (2) the November 21 message came less than two weeks after the November 8 message, also from Masetti Meech, identifying the location of Ms. Shannon's car stolen by defendant; (3) the November 21 message came after defendant had attacked Ms. Shannon in her apartment on November 3 and pointed a gun at her 15-year-old son; (4) the November 21 message again threatened to attack Ms. Shannon and her son, as well as other of her family members; and (5) the November 21 message displayed intimate knowledge of Ms. Shannon's work address and her family members' residential addresses.

¶ 38    Based on all this evidence, we cannot say that the trial court abused its discretion in finding that the November 8 and November 21 Facebook messages from Masetti Meech to Ms. Shannon had been authenticated as coming from defendant.

¶ 39    Next, defendant contends that the State failed to prove him guilty beyond a reasonable doubt of possession of a stolen or converted motor vehicle in connection with his allegedly unlawful possession of Ms. Shannon's 2014 Kia Sedona because the State failed to prove that he took the car with the intent to permanently deprive Ms. Shannon of its use. The relevant question when reviewing the sufficiency of the evidence is whether, after viewing all the evidence in the light most favorable to the State, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. *People v. Davison*, 233 Ill. 2d 30, 43 (2009).

¶ 40    Section 4-103(a)(1) of the Illinois Vehicle Code states that it is a felony for a person not entitled to the possession of a vehicle to possess it, knowing it to have been "stolen or converted." 625 ILCS 5/4-103(a)(1) (West 2014). Thus, a conviction under section 4-103(a) may be predicated on defendant possessing a vehicle, knowing that it was stolen, or on defendant possessing a vehicle, knowing that it was converted. Where the indictment charges defendant with a violation of section 4-103(a)(1) based on his knowing possession of a vehicle that he had stolen, and makes no charge based on the vehicle being converted, the State must show that a "theft" occurred, an essential element of which is the intent to permanently deprive the owner of the use and benefit of the vehicle. *People v. Bivens*, 156 Ill. App. 3d 222, 229-30 (1987). In the present case, though, defendant's indictment did not charge him with a violation of section 4-103(a)(1) based only on his knowing possession of a stolen vehicle; rather, it

alleged that "he, not being entitled to the possession of a motor vehicle, to wit: a 2014 Kia Sedona, property of Anita Shannon, possessed said vehicle knowing it to have been stolen *or converted*." (Emphasis added.) Therefore, to sustain a conviction for this offense as charged, the State was required to prove beyond a reasonable doubt that defendant (1) possessed Ms. Shannon's 2014 Kia Sedona, (2) was not entitled to possess the vehicle, and (3) knew that the vehicle was either stolen *or* that it was converted.

¶ 41　　"Conversion" of property requires that defendant wrongfully deprive the owner of her vehicle, but it does not require an intent to permanently deprive the rightful owner of possession. See *People v. Gengler*, 251 Ill. App. 3d 213, 221-22 (1993); *People v. Washington*, 184 Ill. App. 3d 703, 709 (1989). The State here proved defendant knowingly and wrongfully deprived Ms. Shannon of her vehicle for several days, which was all the evidence that was necessary to sustain his conviction as charged under section 4-103(a)(1). Viewing the evidence in the light most favorable to the State (*Davidson*, 233 Ill. 2d at 43), any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt.

¶ 42　　Next, defendant argues that the trial court erred by admitting photographs of Ms. Shannon's keys to the 2014 Kia Sedona, which were allegedly recovered from defendant during his custodial search because the State failed to establish a chain of custody sufficient to show that the keys were actually recovered from defendant. Before real evidence may be admitted at trial, the State must provide an adequate foundation establishing that the item sought to be introduced is the actual item involved in the alleged offense and that its condition is substantially unchanged. *People v. Whirl*, 351 Ill. App. 3d 464, 470 (2004). A sufficiently complete chain of custody will include delivery, presence, and safekeeping of the evidence. *Id.* at 471.

¶ 43　　In the present case, the only chain of custody evidence came from Officer Austin, who testified that custodial searches are performed in "all arrests" and that all items recovered from defendant during such a search are placed in an inventory bag and stored in lockup. However, Officer Austin admitted that he did not personally perform the custodial search of defendant, he does not remember whether he was present during the search, and he does not recall where the search occurred. No other officer testified that he or she searched defendant at or near the time of arrest and recovered Ms. Shannon's car keys from him. No officer testified to what, if any, protective measures were taken to safeguard the keys. No officer testified to his or her process of inventorying the keys and storing them in lockup.[1] On this record, the chain of custody is missing too many links and is insufficient to show that the car keys in the photograph were recovered from defendant during a custodial search.

¶ 44　　However, the error in admitting the photograph of the car keys was harmless because, even in the absence of the photograph, defendant would have been convicted based on Ms. Shannon's testimony, which the trial court found credible. See *People v. Mullins*, 242 Ill. 2d 1, 23 (2011) (error is harmless where defendant would have been convicted regardless of the error).

---

[1]Detective Murawski testified that after defendant's arrest, he retrieved a personal property bag from lockup with defendant's last name on it and showed it to Ms. Shannon, who identified her missing car keys. However, Detective Murawski never provided any chain of custody testimony regarding how, where, or when the keys were discovered, delivered, or safeguarded.

¶ 45     Next, defendant contends that the trial court erred by failing to conduct a hearing pursuant to *Krankel*, 102 Ill. 2d 181, regarding his posttrial claim of ineffective assistance of counsel. When a defendant presents a posttrial *pro se* claim of ineffective assistance of counsel, the trial court should first consider the factual basis underlying defendant's claim. *People v. Moore*, 207 Ill. 2d 68, 77-78 (2003). If the trial court determines that the points raised are meritless or pertain to trial strategy, then it may deny the motion. *Id.* at 78. If the allegations show possible ineffective assistance, then the court should appoint new counsel to evaluate defendant's claim. *People v. Chapman*, 194 Ill. 2d 186, 230 (2000).

¶ 46     The State agrees that a *Krankel* hearing should have been held in this case. Accordingly, we remand for the trial court to conduct a *Krankel* hearing on defendant's posttrial claim of ineffective assistance of counsel.

¶ 47     Next, defendant contends that the trial court erred during sentencing when it stated that it had considered not only defendant's prior convictions but also "other matters that the State brought to my attention." Defendant argues that the court did not say what those "other matters" were or when the State had brought them to its attention. Accordingly, defendant asks us to reverse and remand for a new sentencing hearing in order to ensure that his sentence was not affected by the court's consideration of improper evidence.

¶ 48     Initially, we note that defendant forfeited review by failing to object during the sentencing hearing. *People v. Enoch*, 122 Ill. 2d 176, 186 (1988).

¶ 49     Forfeiture aside, we find no reversible sentencing error. During the sentencing hearing, the State argued in aggravation as follows:

> "He has four felony convictions. A 2009 possession of a stolen motor vehicle which he was sentenced to four years in the Illinois Department of Corrections. Three felony violations of an order of protection from 2009. *** He was sentenced concurrently to three years in the Illinois Department of Corrections. During sentencing, which it was a plea, *** the defendant was held in direct criminal contempt *** when he tore up the order of protection that was issued during the plea. He received six months additional penitentiary time on the direct criminal contempt.
>
> He has nine misdemeanor convictions, including a 2013 domestic battery where he was sentenced to 100 days in the Cook County Department of Corrections. A 2007 drinking on the public way. A 2007 criminal damage to property. That was a domestic. The victim was a girlfriend as well. He was sentenced to one year of probation on that. He violated that probation and was sentenced to jail time. A 2007 aggravated assault. He was sentenced to probation. That was terminated unsuccessfully. A 2005 disorderly conduct. A 2005 possession of cannabis. A 2005 battery. And, Judge, there's two additional violations of an order of protection misdemeanor offenses. Those are from 2007. He was sentenced to 100 days on one of those and 250 days on the other one."

¶ 50     Following all the aggravating and mitigating evidence, the trial court specifically referenced the State's argument in aggravation regarding defendant's convictions:

> "[The evidence] shows a person who basically since at least 2009 or before, probably, was a career abuser. *** Domestic battery, September 2013, 100 days in the county jail, domestic battery. Possession of a stolen vehicle, 2009, four years. Before that, also in the same year, he got sentenced with three other cases, three years concurrent. And the three other ones all involved violations of an order of protection,

*** based on prior domestic battery. Three similar charges of violation of order of protection three separate times ***. Three years concurrent to the four that he got for the possession of stolen vehicle charge. There's also I believe *other matters that the State brought to my attention as well which I've considered.*" (Emphasis added.)

¶ 51    Clearly, the "other matters that the State brought to [its] attention" referred to defendant's remaining convictions for drinking on the public way, criminal damage to property, aggravated assault, disorderly conduct, possession of cannabis, and battery that the State had argued in aggravation. The trial court committed no error in considering these "other matters," as defendant's criminal history was a statutory aggravating factor that the trial court could properly consider when imposing sentence. See 730 ILCS 5/5-5-3.2(a)(3) (West 2014). There is no evidence in the record that the "other matters" referenced by the trial court involved anything other than defendant's criminal history.

¶ 52    Next, defendant argues that the order of protection should be vacated because it was entered in contravention of the Illinois Domestic Violence Act of 1986 (Act) (750 ILCS 60/214 (West 2014)). Defendant forfeited review by failing to object at trial. *People v. Hillier*, 237 Ill. 2d 539, 544-45 (2010).

¶ 53    Forfeiture aside, we find no reversible error. The Act protects victims of domestic violence from further acts of physical, emotional, and verbal abuse. *Dibenedetto v. Dibenedetto*, 2019 IL App (3d) 180761, ¶ 15. To issue an order of protection, the trial court must find that defendant abused the petitioner. *Id.* If the court makes a finding of abuse, the court is required to make certain findings in "an official record or in writing" prior to issuing an order of protection. 750 ILCS 60/214(c)(3)(West 2014). The official record or written order must show that the trial court considered the "relevant factors" defined as:

> "the nature, frequency, severity, pattern and consequences of the respondent's past abuse, neglect or exploitation of the petitioner or any family or household member, including the concealment of his or her location in order to evade service of process or notice, and the likelihood of danger of future abuse, neglect, or exploitation to petitioner or any member of petitioner's or respondent's family or household." *Id.* § 214(c)(1)(i).

¶ 54    After the trial court considers the relevant factors, section 214(c)(3)(ii) requires that it make an oral or written finding that "the conduct or actions of respondent, unless prohibited, will likely cause irreparable harm or continued abuse." *Id.* § 214(c)(3)(ii). The court must also find that "it is necessary to grant the requested relief in order to protect petitioner." *Id.* § 214(c)(3)(iii). We will reverse the trial court's entry of an order of protection if it fails to make the required findings. *Dibenedetto*, 2019 IL App (3d) 180761, ¶ 16.

¶ 55    Defendant contends that the trial court did not consider the relevant statutory factors and did not find that the order was necessary to prevent him from inflicting irreparable harm or continued abuse on Ms. Shannon and her family or that the order was necessary to protect Ms. Shannon and her family from defendant.

¶ 56    The record belies defendant's argument. At the close of trial, the court stated:

> "Based on the evidence that I heard at the trial, the evidence based on his prior record and for what they were, [defendant] is a dangerous young man. He takes out his hostility on other people. In this case, he just wouldn't take no for an answer. Shannon didn't want him anymore. He wouldn't take no for an answer. For whatever reason,

even though she didn't want to see him anymore, he wouldn't let it end at that. He winds up *** in her house by force, getting in by pushing the door open, and then chokes her, hits her head against the dresser *** a few times. She wasn't injured to the extent that she had to be hospitalized for weeks or months or whatever, but nonetheless she was, in fact, injured ***."

¶ 57    The trial court then discussed defendant's criminal background, including his previous violations of an order of protection, and stated:

"So it shows that he has a propensity or—based on his record to use force to do bad things when someone doesn't get along with him for whatever reason, at least in his mind anyway. *** And further, *** he didn't learn from those other experiences when he was in custody anywhere. Three priors for violation of protection based on a domestic battery—based on a prior domestic battery, I should say. So he didn't learn. He gets out and then this case, domestic violence shown against Ms. Shannon as well who just really wanted to say no, that's all. I don't want you anymore. Leave me alone. Find somebody else. He wouldn't take no for an answer."

¶ 58    The trial court stated that after "considering [defendant's] record," it would sign the order of protection.

¶ 59    The trial court's recitation of defendant's attack on Ms. Shannon and his criminal history, and its finding that defendant is a "dangerous young man" with a "propensity to use force and "do bad things when someone doesn't go along with him" and who refuses to take "no for an answer," shows that it considered the relevant statutory factors set forth in section 214(c)(1)(i). The court's statements also indicate that it found that the order of protection was necessary to prevent continued abuse and to protect Ms. Shannon from defendant, in accordance with section 214(c)(3)(ii) and (iii). Accordingly, the trial court satisfied the dictates of the Act. We find no reversible error.

¶ 60    Finally, both defendant and the State agree that the mittimus must be corrected to reflect that he was convicted of home invasion under section 19-6(a)(2) of the Criminal Code (720 ILCS 5/19-6(a)(2) (West 2014)), which requires a showing that defendant intentionally caused an injury during the home invasion. The mittimus, however, incorrectly states that defendant was convicted of home invasion while armed with a firearm under section 19-6(a)(3) (*id.* § 19-6(a)(3)). Pursuant to our authority under Illinois Supreme Court Rule 615(b) (eff. Jan. 1, 1967), we correct the mittimus to accurately reflect defendant's conviction under section 19-6(a)(2). See *People v. Spicer*, 379 Ill. App. 3d 441, 469 (2007) (pursuant to Rule 615(b), the reviewing court may correct the mittimus without remanding the cause to the trial court).

¶ 61    For all the foregoing reasons, we affirm defendant's convictions and sentence; correct the mittimus; and remand for a preliminary *Krankel* hearing.

¶ 62    Affirmed and remanded; mittimus corrected.