NOTICE
This order was filed under Supreme Court Rule 23 and may not be cited as precedent by any party except in the limited circumstances allowed under Rule 23(e)(1).

2020 IL App (4th) 190631-U

NO. 4-19-0631

IN THE APPELLATE COURT

OF ILLINOIS

FOURTH DISTRICT

FILED
July 14, 2020
Carla Bender
4th District Appellate
Court, IL

| | | |
|---|---|---|
| MANDRA RILEY, | ) | Appeal from |
|     Petitioner-Appellee, | ) | Circuit Court of |
|     v. | ) | Vermilion County |
| MARY B. MULHOLLAND-KAFAR, | ) | No. 19OP286 |
|     Respondent-Appellant. | ) | |
| | ) | Honorable |
| | ) | Charles C. Hall, |
| | ) | Judge Presiding. |

JUSTICE HOLDER WHITE delivered the judgment of the court.
Justices Cavanagh and Harris concurred in the judgment.

**ORDER**

¶ 1    *Held*: The appellate court affirmed, concluding (1) any error in evidentiary rulings was harmless and (2) the trial court made the required findings under the Domestic Violence Act.

¶ 2    In June 2019, petitioner, Mandra Riley, filed a verified petition for an order of protection on behalf of Marcia Kafar against respondent, Mary B. Mulholland-Kafar. Following an August 2019 hearing, the trial court entered a plenary order of protection against respondent.

¶ 3    Respondent appeals, arguing the trial court erred by (1) allowing irrelevant evidence that petitioner failed to plead in her verified petition for an order of protection and (2) not making specific findings as required by section 214 of the Illinois Domestic Violence Act of 1986 (Domestic Violence Act) (750 ILCS 60/214(c) (West 2018)). For the following reasons, we affirm the trial court's judgment.

¶ 4                       I. BACKGROUND

¶ 5       A. Petition for an Order of Protection

¶ 6    In June 2019, petitioner filed a verified petition for an order of protection on behalf of respondent's spouse, Marcia Kafar, a high-risk adult. The petition alleged Marcia had "vascular dementia, TBI and has had several strokes with paralysis on the left side." The petition alleged respondent verbally and physically abused Marcia. According to the petition, hospitals and nursing homes made numerous reports of respondent raising her fist to Marcia, screaming at Marcia, and choking Marcia to make her eat or take medication. The petition further alleged Marcia had bruises on her face and arms, and she informed others that respondent hit her. In March 2019, respondent was banned from a nursing home due to her verbal abuse of Marcia. The nursing home filed a police report against respondent for domestic violence.

¶ 7    The petition stated, "Marcia has deteriorated significantly since returning home with [r]espondent." In May 2019, petitioner was awarded temporary guardianship of Marcia, who was "currently in the hospital due to several ulcers on her bottom, dehydration[,] and loss of weight while residing with [r]espondent." Finally, the petition alleged petitioner received "countless" telephone calls from respondent, who harassed petitioner and gave petitioner's telephone number to others.

¶ 8      B. Plenary Order of Protection Hearing

¶ 9    In August 2019, the trial court held a hearing on the petition for an order of protection.

¶ 10        1. *Sandra Shepherd*

¶ 11    Sandra Shepherd testified she worked for CRIS Healthy-Aging Center as an adult protective services investigator and the coordinator of the violent crime victim witness program. In February 2019, Shepherd received an elder abuse report regarding Marcia. Shepherd testified

she went to visit Marcia and respondent was present. Shepherd addressed the report's allegations that Marcia arrived at various appointments with bruising on her face and arms. According to Shepherd, Marcia said she believed she was hitting herself. During Shepherd's investigation, staff at the VA reported Marcia attended appointments with bruising on her face. Staff at North Logan reported Marcia came in with bruising and respondent emotionally abused her. According to Shepherd, the nursing home had to call police at one point and the staff were instructed to supervise visits between Marcia and respondent. Prior to February 2019, Marcia was in long-term care at The Waters of Covington. Respondent removed Marcia from The Waters of Covington against medical advice.

¶ 12      Shepherd testified that Marcia received $3000 a month in VA benefits. Shepherd testified respondent previously removed Marcia from long-term care. According to Shepherd, respondent received $300 per month for caring for Marcia in her home. Respondent only received the $300 if Marcia was in the home. When asked what happened with Marcia's health when respondent removed her from long-term care, Shepherd testified,

> "Her health declined. Um, she—while she was in the
> nursing home she was eating, she was happy, um, her color had
> returned. Uh, when she goes home she, um, this last time she
> ended up back in hospital a week later.
>
> Uh, she becomes, uh, when I would see her she was very,
> um, almost depressed looking, uh, her color was bad, she was not
> very responsive."

¶ 13      Over defense counsel's objection, the trial court allowed Shepherd to testify regarding her concerns about Marcia's finances. Shepherd testified "a lot" of Marcia's income

- 3 -

went to providing respondent with personal care, such as having her nails done. Although Marcia had $3000 in monthly income, CRIS paid the deposit for an apartment because respondent and Marcia did not have enough money. According to Shepherd, Marcia's income also went to "various *** attorneys and other individuals." In addition to her monthly income, Marcia also received full coverage for her medical care through the VA.

¶ 14                                    2. *Jamie Fassold*

¶ 15            Jamie Fassold, a home care aide with Community Care, testified she helped clients with cleaning, bathing, and cooking. In late February or early March 2019, Fassold began providing Marcia in-home care. On a Friday in the first week of March, Fassold observed respondent sit on Marcia, grab Marcia's throat, and hit Marcia on the left side of her face over taking medication. Fassold called her supervisor who informed her respondent asked if Fassold could return. Fassold agreed on the condition that no medications were given to Marcia. According to Fassold, Marcia did not like taking her medication and often refused to take the medication. When Marcia refused to take her medication, respondent would put the medication in Marcia's mouth, grab her throat, and force water into her mouth. On several occasions, Fassold observed Marcia "was bruised up real bad on her left side of the face and had little bruises all over her chest, and her arm was pretty bruised up all the time."

¶ 16            Fassold testified Marcia only used a wheelchair when she went places, and she was otherwise in her recliner or her bed. Fassold only witnessed respondent hit Marcia once, but Fassold heard yelling over Marcia's medication when she was in a different room. Fassold testified she did not go into the room on these occasions "because it was [her] first time doing that kind of thing and it kind of startled [her]." Fassold called her supervisor to report these incidents. In the two or three months Fassold provided Marcia in-home care, respondent often

lost her temper. According to Fassold, it was very uncomfortable to be around respondent because she yelled, cursed, and swore at Marcia and others over the phone. Fassold testified she also heard Marcia swear when she was going back and forth with respondent.

¶ 17                                              3. *Petitioner*

¶ 18          Petitioner testified Marcia was her aunt and she had recently been appointed Marcia's guardian. According to petitioner, she filed for an order of protection because there were multiple allegations of abuse, financial exploitation, and secluding Marcia from her family. Petitioner testified Marcia told her she was being abused. Respondent did not directly contact petitioner, but several individuals contacted petitioner seeking information as to Marcia's whereabouts. There were posts on Facebook accusing petitioner of abducting Marcia and making petitioner's personal information public.

¶ 19          The petition for a plenary order of protection was based on numerous allegations of abuse and Marcia's comments. The petition also sought to prohibit respondent from harassing or interfering with the personal liberty of Marcia. Petitioner expressed concerns regarding financial exploitation, citing various "GoFundMe" pages asking for donations for medical and legal expenses and displaying Marcia's military photograph. Petitioner lacked access to Marcia's veteran's funds and paid for Marcia's expenses out of her own pocket. According to petitioner, she was working with the VA because they had a different fiduciary system than the authority she had through the guardianship proceeding. Petitioner testified the VA funds were being directly deposited to an account but respondent had not indicated where those funds could be accessed.

¶ 20          Petitioner testified that when Marcia arrived at The Waters of Covington "she was severely dehydrated to the point they could almost not draw blood. Um, she wasn't eating, she

was very somber, um, very [d]epressed, um, wouldn't communicate, but minimally." Petitioner visited Marcia at the nursing home and her color had improved. Since being at the nursing home, Marcia was sarcastic and funny, no longer needed insulin because her food was regulated, and she visited with the other residents. Petitioner testified she spoke with the nursing home weekly to monitor Marcia's other medications. According to petitioner, she tried to sign in to Marcia's "My Healthy Vet" account "a couple days ago." The account provided information about prescriptions and medical appointments. However, petitioner discovered the password had been changed, petitioner was removed as Marcia's emergency contact, and respondent had been replaced as the emergency contact. Petitioner testified she had not seen any bruising on Marcia since she went to the nursing home. Petitioner opined it would be detrimental to Marcia's health to have visits with respondent.

¶ 21                              4. *Shacoya Moore*

¶ 22           Shacoya Moore testified she worked for the Department of Rehabilitation Services as a homecare worker, making sure her clients take their medications, preparing meals, and cleaning. Moore provided Marcia with in-home care from early May 2019 to early July 2019, when Marcia was transferred to a nursing home. Initially, Moore was in the home Thursday through Saturday and eventually worked in the home Monday through Saturday for approximately two weeks. As a part of her responsibilities, Moore transported Marcia to her VA appointments. Moore testified she never witnessed respondent verbally or physically abuse Marcia. According to Moore, respondent helped care for Marcia by assisting with bathing, dressing, and feeding her. Moore testified she gave Marcia medication by placing the medication in her mouth and giving her a cup. Moore did not notice a significant decrease in Marcia's weight.

¶ 23                                    5. *Terri Stone*

¶ 24          Terri Stone testified she met respondent 20 years earlier via an internet support

group for former Mormon lesbians. Stone met Marcia 10 years earlier when she began dating

respondent. Stone testified she video chatted twice a week with Marcia and respondent from

January to May 2019. When asked if she observed anything healthwise with Marcia, Stone

responded as follows:

> "Other than her obstinance to be compliant with her care,
>
> no. She—she would try to be getting into bed—of clarification of
>
> what I just said—[respondent] would be trying to get her into bed
>
> and instead of stepping to the left she'd want to go to the right, and
>
> if [respondent] couldn't get her in any other way she would call me
>
> and I would talk to [Marcia] and get her to calm down and go the
>
> other way. I mean, we would try anything—cause Mar—Marcia
>
> will listen to me."

Stone testified she never witnessed respondent verbally or physically abuse Marcia. According

to Stone, she attended other court hearings involving respondent, but she did not otherwise visit

respondent and Marcia in Danville.

¶ 25                                    6. *Respondent*

¶ 26          Respondent testified she met Marcia in September 2006 and the two married in

November 2013. According to respondent, Marcia suffered from posttraumatic stress disorder

(PTSD) due to military sexual trauma. In January 2017, Marcia suffered a stroke. Respondent

testified Marcia's PTSD got worse following her stroke. Respondent cared for Marcia until June

2019 at their apartment in Danville. Respondent gave Marcia her medication, helped her bathe,

- 7 -

and made sure Marcia ate properly. According to respondent, Marcia sometimes became combative over taking her medication.

¶ 27 Respondent testified she did not recall the specific day that Fassold described in her testimony. However, respondent testified that she did not sit on Marcia. When she gave Marcia her medication, respondent sat on the arm of the recliner to help give the medication. According to respondent, Marcia had difficulty swallowing the larger pills so respondent would try to place the larger pills as far back as possible on Marcia's tongue. Respondent denied striking Marcia on the face but stated she would hold Marcia and massage her throat to help her swallow the pills. Respondent stated she observed bruises on Marcia's face. In March 2019, respondent observed Marcia hitting herself and saying, "Bad girl, bad girl, bad girl." Respondent denied being verbally abusive but stated that Marcia would sometimes swear at respondent and respondent would respond with a swear word.

¶ 28 Respondent testified she was familiar with the "My Vets" webpage. Marcia gave respondent authority to access the webpage when she lived with respondent. However, respondent had no access to the webpage once Marcia went to The Waters of Covington. Respondent denied making any changes to Marcia's account. According to respondent, she had no contact with petitioner regarding any financial accounts because there was a temporary order of protection in place prohibiting respondent from having contact with petitioner.

¶ 29 Respondent testified Marcia's veteran's benefits were deposited in a joint account. Respondent denied receiving a $300 monthly stipend when Marcia lived at home in respondent's care. After respondent received notice of the guardianship case, she hired an attorney. Respondent testified she was not currently employed because she was Marcia's full-time caregiver. According to respondent, Marcia's veteran's benefits recently increased

from $2100 to $3000, and a portion of the benefits were for Marcia's spouse. Respondent testified she moved funds from the joint account to her own personal account "to make sure that [she was] taken care of."

¶ 30     Respondent contacted the ambulance service for a lift assist when Marcia would slip down in her recliner. Marcia periodically had respite stays in a long-term care facility to allow respondent a break from caregiving. Respondent testified Marcia was considered 100% disabled as of May 2019. Respondent described her occupation as being a "[h]ousewife with caregiver a second." According to respondent, Marcia gave her permission to move the funds prior to the guardianship proceeding. Respondent continued to pay bills in both her and Marcia's names.

¶ 31                               C. Trial Court's Ruling

¶ 32     The trial court first noted the standard of proof was a preponderance of the evidence. The judge then stated, "[F]irst, I begin by saying the [c]ourt does have jurisdiction over the parties hereto and the subject matter herein under Section 208 of Act, and as far as the requirements that need to be met under Section 214, I wanta [*sic*] point out a few things." The court found Fassold's testimony credible that Marcia was removed from long-term care against medical advice. Marcia's health was poor when she was placed back in the nursing home and her health improved greatly under the more direct supervision of petitioner as guardian.

¶ 33     The trial court further found substantial evidence of financial exploitation. Respondent received income from Marcia's benefits that she claimed were a gift. The court noted Marcia's various health problems and expressed its doubts about where Marcia's benefits were going and whether there was a valid gift made to respondent.

¶ 34    The trial court found respondent's explanation of the incident witnessed by Fassold to be incredible. Conversely, the court found Fassold's account of the incident credible and found it disturbing how many times Marcia was observed with bruises. The court stated it was not unreasonable to conclude that problems existed because of respondent's temper, frustration, and occasional explosions. The court further noted that yelling, screaming, cursing, and swearing was inappropriate in caring for "a disabled adult suffering from trauma from various courses of prior activity and abuse." The court rejected Stone's testimony that no abuse occurred based on her video chats.

¶ 35    Finally, the trial court found that Marcia's improved health was another indicator of abuse. The court concluded the evidence was substantial and "the only way to prevent further abuse, uh, both physical, and emotional, and mental is to grant the [p]lenary [o]rder." Accordingly, the court stated the plenary order would be in effect for two years and the remedies listed in the order were "intended to prevent what would likely occur again if we didn't do this."

¶ 36    This appeal followed.

¶ 37                                II. ANALYSIS

¶ 38    Initially, we note petitioner failed to file an appellee brief in this case. "When an appellee fails to file a brief, reviewing courts will decide the merits of the appeal if the record is simple and the errors can be easily decided without the aid of an appellee's brief." *In re Marriage of Takata*, 383 Ill. App. 3d 782, 787, 890 N.E.2d 688, 692 (2008) (citing *First Capitol Mortgage Corp. v. Talandis Construction Corp.*, 63 Ill. 2d 128, 345 N.E.2d 493 (1976)). However, if the appellant's brief shows a *prima facie* reversible error supported by the record, the trial court's judgment may be reversed. *Id.*

¶ 39          On appeal, respondent argues the trial court erred by (1) allowing irrelevant evidence that petitioner failed to plead in her verified petition for an order of protection and (2) not making specific findings that the order of protection should be granted.

¶ 40                                    A. Trial Court's Evidentiary Rulings

¶ 41          Respondent asserts the trial court erred in allowing irrelevant evidence that was not pleaded in the verified petition for an order of protection.

¶ 42          We review a trial court's decision to admit evidence for an abuse of discretion. *Kincaid v. Ames Department Stores, Inc.*, 283 Ill. App. 3d 555, 566, 670 N.E.2d 1103, 1111 (1996). The court's ruling will not be reversed absent a clear showing the court abused its discretion. *Id.*

¶ 43          We begin by noting respondent failed to preserve several of the errors raised on appeal. *Baumrucker v. Express Cab Dispatch, Inc.*, 2017 IL App (1st) 161278, ¶ 54, 84 N.E.3d 482 ("Failure to object at trial results in forfeiture of the issue on appeal."). Specifically, Shepherd's testimony that Marcia was removed "AMA" was elicited by respondent's counsel on cross-examination. Respondent's counsel failed to object when petitioner's counsel asked what the acronym stood for and Shepherd stated, "Against medical advice." Respondent also failed to object to any of petitioner's testimony regarding exploitation. However, respondent did object to some of the testimony regarding financial exploitation given by Shepherd and by respondent during cross-examination. Although we are not prepared to find the trial court abused its discretion in finding this testimony relevant—particularly on cross-examination of respondent, where the evidence had relevance to respondent's credibility—we conclude respondent has preserved this issue for appeal.

¶ 44        Even if we assume the trial court abused its discretion in allowing this testimony, we conclude any error was harmless. First, there was ample other evidence of abuse presented to the court. Multiple witnesses testified they witnessed bruises on Marcia's arms and face and Fassold testified she witnessed an incident in which respondent physically restrained Marcia, forced medication into her mouth, and held her by the throat in an attempt to give her medication. Although the court mentioned financial exploitation in its findings, the court was clearly focused on the allegations of physical and verbal abuse. Even without testimony regarding financial abuse, the outcome in this case would have been the same. Again, we do not find the evidence related to financial exploitation was necessarily irrelevant but, assuming *arguendo* that the court abused its discretion in admitting the evidence, we conclude any error was harmless. The outcome of the proceeding would have resulted in a finding of abuse and the entry of a plenary order of protection. Accordingly, we affirm the court's judgment.

¶ 45                    B. Trial Court's Findings

¶ 46        Section 214 of the Domestic Violence Act requires a trial court, in determining whether to grant a specific remedy, to consider relevant factors that include, but are not limited to, the following: "the nature, frequency, severity, pattern and consequences of the respondent's past abuse, neglect or exploitation of the petitioner or any family or household member, including the concealment of his or her location in order to evade service of process or notice, and the likelihood of danger of future abuse, neglect, or exploitation to petitioner or any member of petitioner's or respondent's family or household." 750 ILCS 60/214(c)(1)(i) (West 2018). The Domestic Violence Act further provides:

        "(3) Subject to the exceptions set forth in paragraph (4) of

        this subsection, the court shall make its findings in an official

- 12 -

record or in writing, and shall at a minimum set forth the following:

(i) That the court has considered the applicable relevant factors described in paragraphs (1) and (2) of this subsection.

(ii) Whether the conduct or actions of respondent, unless prohibited, will likely cause irreparable harm or continued abuse.

(iii) Whether it is necessary to grant the requested relief in order to protect petitioner or other alleged abused persons." 750 ILCS 60/214(c)(3) (West 2018).

¶ 47 Respondent contends the trial court failed to make the required findings under section 214 of the Domestic Violence Act. In support, respondent cites *Landmann v. Landmann*, 2019 IL App (5th) 180137, 133 N.E.3d 117. In *Landmann*, the appellate court concluded "neither the trial court's oral pronouncement that it 'heard the evidence [and] considered the credibility of the witnesses,' nor the court's written order stating it had reviewed the petition and heard the evidence" satisfied the requirement that the court set forth that it had considered the applicable relevant factors. *Id.* ¶ 18. It appears these are the only statements made by the trial court in *Landmann*.

¶ 48 In this case, the trial court specifically stated it was considering the requirements of section 214 and engaged in a lengthy discussion of the evidence of abuse. The court made specific credibility findings, discussed the nature of the abuse, pointed to multiple instances where Marcia was observed to have bruises, and found Marcia's improved health was another indicator of abuse. The court concluded the evidence was substantial and "the only way to prevent further abuse, uh, both physical, and emotional, and mental is to grant the [p]lenary

- 13 -

[o]rder." Accordingly, the court stated the plenary order would be in effect for two years and the remedies listed in the order were "intended to prevent what would likely occur again if we didn't do this."

¶ 49       The trial court's oral statements show it considered "the nature, frequency, severity, pattern[,] and consequences" of the past abuse. 750 ILCS 60/214(c)(1)(i) (West 2018). The court also explicitly stated the order of protection was necessary to prevent further abuse and to protect Marcia from respondent in accordance with section 214(c)(3)(ii) and (iii). *People v. Brand*, 2020 IL App (1st) 171728, ¶ 59 (trial court's oral statements satisfied the dictates of the Domestic Violence Act). We conclude the court complied with the requirements set forth in the Domestic Violence Act and affirm the court's judgment.

¶ 50                      III. CONCLUSION

¶ 51       For the reasons stated, we affirm the trial court's judgment.

¶ 52       Affirmed.